MICHAEL STRINGER AND MATTHEW DAVID FAESSEL, APPELLANTS, v. THE STATE OF NEVADA, RESPONDENT.

No. 22008

July 2, 1992                                    836 P.2d 609

*John Ohlson,* Reno, for Appellant Michael Stringer.

*Karp & Company, Ltd.,* Reno, for Appellant Matthew David Faessel.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Dorothy Nash Holmes,* District Attorney and *Scott Edwards,* Deputy District Attorney, Washoe County, for Respondent.

# OPINION

*Per Curiam:*

Appellants were convicted by a jury of first degree murder. Both appellants claim on appeal that their respective police confessions were improperly obtained and that these confessions should not have been admitted at trial. One appellant also claims that he was unfairly prejudiced by the trial court's admission of certain pictures and literature dealing with white supremacist philosophy. We conclude that the trial court did not abuse its discretion and affirm the convictions.

## THE FACTS

Matthew David Faessel ("Faessel") and Michael Stringer ("Stringer") associated themselves with a group of white supremacists known as "skinheads."

On December 9, 1988, Stringer invited a female acquaintance, Angela Stanley ("Stanley"), to a skinhead party held at an apartment in Sparks, Nevada. Stanley came to the party with Justine Figurski ("Figurski") and Katrina Tunno ("Tunno").

Upon their arrival, the young women began drinking with the approximately ten to fifteen other people at the party. Figurski knew little about skinheads, although she understood that "they didn't like blacks." Soon, Figurski was drawn into a discussion about skinhead philosophy. Taking issue with the racial philosophy of the skinheads, and in an effort to prove that "black people aren't bad," Figurski boldly announced that she had black friends. Figurski then stated that she had "been raped by a black guy and a white guy and that either could do bad." This statement sent several members of the group into a rage. One of the enraged skinheads became so infuriated at Figurski's comment that he made a violent attempt to strangle her before he was subdued by others at the party.

At this point Stanley and Stringer left the party for a short time in Figurski's car. When they returned, they saw Faessel screaming in the middle of the street. Apparently still upset at hearing that Figurski had once been raped by a black man, Faessel told Stringer and Stanley that he was on his way to a nearby store to "stab anybody." Stringer and Stanley convinced Faessel to abandon his plan and join them. Faessel then entered the back seat of Figurski's car, and the group drove away.

While riding in Figurski's car, Faessel and Stringer decided that they would vent their anger by shooting a black person. Stanley drove to the house of a fellow skinhead, where Faessel had been keeping a gun and ammunition.[1] Faessel ran into the garage and returned with bullets about fifteen minutes later. Stanley testified that she first became aware that Faessel had a gun when he began loading it in the back seat of Figurski's car as she drove away from the house.

As they drove away, Stringer rolled down his window to allow Faessel to shoot from the back seat, and Faessel began shooting at inanimate objects. The group then drove to a predominately black neighborhood in Reno, referred to by skinheads as "brown town," for the sole purpose of "shooting a nigger." Stringer helped Faessel locate a human target. After passing up one possible victim, the group spotted a second person walking alone along the street. Faessel apparently had already taken aim when Stringer stopped him, saying, "Don't shoot him, he's white."

Tony Lydell Montgomery ("Montgomery") was the unfortunate third person spotted by Stringer. At approximately 1:30 a.m., on December 10, 1988, Montgomery was walking toward the group's vehicle on the left hand side of the street in Reno.

[1]Before the party, Stringer had gone to the same house to retrieve Faessel's .22 caliber semi-automatic rifle. Faessel apparently had the gun with him, under his coat, when he got in the car with Stringer and Stanley.

Once Stringer was sure Montgomery was black, he told Stanley to turn the car around and follow him. As the car approached Montgomery, Stringer rolled his window down and Faessel fired seven shots, one of which fatally wounded Montgomery. The other six shots struck two homes located immediately behind Montgomery. After being shot, Montgomery grabbed his chest and ran across the street, collapsing on the doorstep of his home. Faessel screamed: "I think I got him. I must have got him. Look at him run." Stringer was laughing and exclaimed: "Yes, we got him." In celebration of their act, Stringer and Faessel exchanged "a high five and a Sieg Heil." Stanley then drove them back to the party.

When the group returned to the party, Faessel lifted up his jacket and pulled out the gun. Although they had warned Stanley to remain silent about the incident, Faessel and Stringer bragged to others about the shooting. The murder weapon was given to Peggy Morris ("Morris") for safekeeping.

A few days later, Donna Pool ("Pool"), mother of one of the other skinheads, learned what happened from Cora Wade, who lived at the Sparks address where the party was held. As a result, Pool called "Secret Witness" to report the incident. Upon learning that they were being investigated by the police, Faessel and Stringer told Morris to get rid of the gun. Morris disposed of the gun in the Truckee River. After Morris disposed of the gun, Stringer confessed to her that he and Faessel had in fact shot a black person.

A few days after the shooting, Faessel was picked up by Reno police and taken in for questioning. Faessel denied any involvement in the shooting. Once released, he left immediately for his mother's home in Bakersfield, California. Faessel later admitted that his departure resulted from his fear of eventually being arrested for murder.

On December 28, 1988, Stringer was brought in for questioning. After agreeing to talk to police, Stringer attempted to convince his interrogators that he was simply a non-participating witness. However, Stringer was arrested after the interview as an accessory after the fact. Based on Stringer's testimony, police sought to apprehend Faessel and Stanley.

A few hours after interrogating Stringer, Reno police officers apprehended Stanley. During questioning, Stanley gave police a detailed account of the events surrounding the shooting.

Reno police learned of Faessel's whereabouts through Pool, whose son received a package from Faessel with a Bakersfield return address. The Bakersfield police were contacted, and Faessel was apprehended on December 31, 1988. Upon being informed of Faessel's arrest, the Reno police dispatched two officers to Bakersfield to question him.

After waiving his *Miranda* rights, Faessel spoke with the Reno officers for about two hours before confessing to his participation in the shooting. Faessel's confession included an admission that he and Stringer had given the murder weapon to Morris and asked her to "get rid of it." After Reno police subsequently searched her bedroom, Morris voluntarily retrieved the rifle from the Truckee River and gave it to police.

Both Faessel and Stringer filed separate motions to suppress their respective confessions on the grounds that they were not given voluntarily. Following separate suppression hearings, the district court ruled the confessions admissible. Stanley ultimately pled guilty to second degree murder in exchange for her testimony.

A jury convicted Stringer and Faessel of murder with the use of a deadly weapon, conspiracy to commit murder, and two counts of discharging a firearm into a dwelling. In addition, Stringer was convicted of being an accessory to murder. The district court sentenced both Stringer and Faessel to two consecutive life sentences with the possibility of parole for the murder charge plus an additional eighteen years for the other counts.

## DISCUSSION
### I. *THE CONFESSIONS*

Faessel and Stringer both claim they were directly and indirectly coerced into providing the police with statements confessing their involvement in Montgomery's death.

The law in this area is well settled. Police officers have an obligation to inform suspects of their right to remain silent and their right to an attorney before custodial interrogation may begin. Miranda v. Arizona, 384 U.S. 436, 479 (1966). Once a suspect has been apprised of these rights, the suspect must affirmatively waive them prior to the interrogation. *Id.* Where a suspect is indecisive about waiving these rights, or makes an equivocal request for counsel, the scope of such questions must be limited to the clarification of the request. Nash v. Estelle, 597 F.2d 513, 517 (5th Cir. 1979) (en banc), *cert. denied,* 444 U.S. 981 (1979) ("it is sound and fully constitutional police practice to clarify the course the suspect elects to choose"). If the suspect then chooses to voluntarily waive these rights, the interrogation may proceed. *Id.* at 518. *See also* United States v. Fouche, 833 F.2d 1284 (9th Cir. 1987), *cert. denied,* 486 U.S. 1017 (1988). In McRoy v. State, 92 Nev. 758, 759, 557 P.2d 1151, 1152 (1976), we held: "The voluntariness of a confession depends upon the facts that surround it, and the judge's decision regarding voluntariness is final unless such finding is plainly untenable . . ." (citing Moser v. United States, 381 F.2d 363 (9th Cir.

1967), *cert. denied,* 389 U.S. 1054 (1968)). In Passama v. State, 103 Nev. 212, 214, 735 P.2d 321, 323 (1987), this court held that the test for voluntariness of a confession is "whether the defendant's will was overborne when he confessed." Finally, pursuant to Sanchez v. State, 103 Nev. 166, 170, 734 P.2d 726, 728 (1987), the State must prove the voluntariness of a confession by a preponderance of the evidence.

## A. *STRINGER'S CONFESSION*

On December 28, 1988, three police officers approached Stringer at his place of employment, handcuffed him and transported him to the police station for questioning. At this time, the extent of Stringer's involvement in Montgomery's murder was unknown. At the police station, Stringer was advised by officers that they would be taping the interview. Stringer then stated: "I don't know if I could even object to it." The officers then assured him that they would turn it off if Stringer desired, but they also explained that the tape was for the protection of everyone involved.

Stringer then presented the officers with a variety of questions about his legal rights. The officers did not offer any legal advice to Stringer. Instead, the officers told Stringer that they would read him his rights in full and, upon receiving them, he would be free to invoke his right to remain silent or to have an attorney or parent present during questioning. Although Stringer exclaimed, "I already know my rights," the officers patiently continued to explain them to him. After reading Stringer his rights, the following exchange transpired:

> STRINGER: Okay, I'll talk to you.
> OFFICER: No first, do you understand your rights?
> STRINGER: Yeah.
> OFFICER: Okay. After you heard your rights, do you want to talk to us?
> STRINGER: Yeah.
> . . .
> OFFICER: Okay. Now since you've decided to talk with us, you can invoke your rights; that is, stop talking, or refuse to talk at any time you so desire. Do you understand that?
> STRINGER: Yeah.
> OFFICER: Or refuse to answer any question you want, or demand an attorney or your parent be present at any time you want, okay?
> STRINGER: But if I can't answer a question because I was drunk . . . ?

OFFICER: Then you don't know. We don't want you to make things up, we just want you to tell us what you saw. Not what you think but what you saw.
STRINGER: All right.
OFFICER: Okay? Is that fair enough?
STRINGER: Yeah.

Stringer's claim that he was tricked and cajoled into waiving his rights and confessing is based largely on a representation made by the interrogating officers that Stringer would be released if he was found to be a witness. This allegation lacks merit. Stringer was the first of the three suspects to be interviewed. Certainly, if Stringer had been found to be merely a witness he would not have been charged with the murder. There was no misrepresentation, no trickery and no deceit. On the contrary, the officers went to great lengths to be truthful with Stringer. Thus, the district court correctly concluded: "The detectives carefully and fairly made certain defendant knew his rights and answered his questions as best they could. Defendant expressly and clearly stated he knew his rights, and he unequivocally chose to waive them."

Although the exchange between Stringer and the officers prior to the interrogation reveals that Stringer was uncertain about the consequences of invoking his rights, the record demonstrates that the officers thoroughly explained his rights to him. Stringer was clearly advised of his right to terminate the interrogation at any time. Therefore, the officers did not "impinge[] on the exercise of [Stringer's] continuing option to cut off the interview." *Fouche*, 833 F.2d at 1287 (quoting Nash v. Estelle, 597 F.2d 513, 518 (5th Cir. 1979) (en banc), *cert. denied*, 444 U.S. 981 (1979)). Further, no incriminating statements were obtained until Stringer had made a full and voluntary waiver of his rights. Accordingly, we agree with the district court that "[a]t no time was [Stringer] tricked, cajoled, threatened, or intimidated into waiving any rights, and [Stringer's] allegations of such conduct are not supported by the transcript." Accordingly, we hold that Stringer's confession was properly admitted by the district court.

## B. *FAESSEL'S CONFESSION*

Faessel claims that he was denied an attorney prior to his interrogation, that he was intimidated by the interrogating officers and that he was coerced into making a statement because he feared for his life. Faessel asserts that the interrogating officers brandished their guns and pointed them at him in an effort to scare him into confessing.

Prior to the interrogation, Faessel signed a waiver of his rights. Faessel later admitted that he signed the waiver with full knowledge of the implications. The interrogation transcript is void of any invocation by Faessel of his rights to remain silent or to counsel. The interrogating officers both testified that Faessel never asked for an attorney before or after he was Mirandized. Therefore, we can come to no other conclusion but that Faessel waived his rights voluntarily.

Faessel's allegation that he suddenly decided to provide the officers with the truth because he feared for his life is completely unsupported in the record. The atmosphere during the interrogation was obviously tense. The officers knew of Faessel's involvement from the statements of Stringer and Stanley and, thus, the officers surmised that he was lying. The officers' frustration with Faessel was quite apparent during certain stretches of the interrogation, but there is no evidence that the officers threatened him. The officers testified that they secured their weapons in a closet in the interrogation room prior to retrieving Faessel from his cell, as required by the Kern County Sheriff's Office in Bakersfield. Both officers denied that the guns were taken from the closet in the presence of Faessel. The officers also denied threatening Faessel with any physical harm. According to the officers, Faessel appeared to be well rested and never requested to leave the room during the interrogation.

After approximately one hour and forty-five minutes of questioning, the officers concluded their interrogation of Faessel. The officers testified that after the recorder was shut off, they were preparing to have Faessel escorted back to his cell. One officer then made a telephone call to Reno to report their progress and check on another murder investigation. According to the officers' testimony, while the officer was speaking on the telephone, Faessel motioned to the other officer that he had something to tell him. As the officer approached him, Faessel said, "I have something to say, turn the recorder back on." The officers turned the recorder back on and Faessel gave his statement. The transcript provides the following:

> Q: Matt, did you want to add something to your statement?
>
> Q: Keep in mind the same things we talked about . . . I know we just ended the statement but I want to make sure you understand the same rights we advised you of your right to remain silent and everything still apply. Do you know that and understand that?
>
> A: Yeah.
>
> Q: Now you told Joe you wanted to tell him something? Fire away.
>
> A: I remember.

Faessel then proceeded to confess, in detail, his participation in the killing of Montgomery. The period of time between terminating and resuming the interrogation was approximately twenty minutes.

Our review of the record reveals nothing coercive or deceptive about the conduct of the officers. The interrogation process was by no means unreasonable. Faessel was interrogated in the early afternoon, and the interrogation lasted less than two hours prior to his confession. Faessel's allegations of abuse are not corroborated from the transcript or the tapes. Accordingly, we conclude that Faessel's claim of coercion has no basis and his confession was properly admitted by the trial court.

## II. *EXHIBITS*

Faessel next claims that he was unfairly prejudiced by the trial court's admission of white supremacist literature confiscated from the apartment where he was residing at the time of the murder. Faessel further argues that other exhibits, which included personal letters and photographs of him displaying his tattoos, subjected him to undue prejudice. Having concluded that the confessions were properly admitted into evidence, these remaining issues are of little consequence.

Faessel had resided at Wade's apartment for several weeks prior to the murder. The skinhead literature was found in a dresser drawer in Wade's bedroom and in a footlocker which Wade claimed belonged to her. The literature was admitted into evidence largely on the basis that a card personally addressed to Faessel was found in the footlocker from which some of the literature was obtained. We agree that there was insufficient evidence linking Faessel to the literature. Nevertheless, we conclude that "the overwhelming evidence of guilt renders such error harmless." Hendee v. State, 92 Nev. 669, 670, 557 P.2d 275, 276 (1976) (citations omitted); *see also* Riley v. State, 107 Nev. 220, 808 P.2d 560 (1991); Chapman v. California, 386 U.S. 18, 24 (1967).

We reject Faessel's claim that he was unduly prejudiced from the admission of certain other evidence illustrative of his philosophical views. Pursuant to NRS 48.035(1), a trial court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." This determination rests within the sound discretion of the trial court. Larson v. State, 102 Nev. 448, 449, 725 P.2d 1214, 1215 (1986). Faessel shot Montgomery solely because he was black. Accordingly, we conclude that the

evidence at issue was germane to the jury's understanding of Faessel's motivation and state of mind at the time of the crime.

## CONCLUSION

For the reasons expressed above, we affirm the judgment entered below.