*1332
 
 OPINION
 

 Per Curiam:
 

 This is an appeal from a judgment of conviction of one count of first-degree murder with use of a deadly weapon pursuant to a jury verdict and from a sentence of death.
 
 [1]
 
 Appellant Michael Hampton Sonner has raised numerous issues pertaining to both the guilt and penalty phases of his trial. We have carefully reviewed each issue and conclude that none has merit. Because Sonner was fairly tried, convicted and sentenced, we affirm.
 

 FACTS
 

 On the evening of November 30, 1993, a red sport utility vehicle stopped at the Trinity Truck Stop at the junction of Interstate 80 and Highway 95, twenty-three miles west of Love-lock. After pumping $22.00 worth of gas, the driver left without paying.
 

 Trooper Carlos Borland was alerted to what had occurred at the truck stop and eventually halted the red Chevy Blazer near Lovelock. Prior to the stop, the Chevy Blazer and Borland’s patrol car both passed Steven and Doyle Anderson. As the Andersons approached the patrol car and the Blazer, Steven Anderson saw Trooper Borland lying on the ground and the Blazer pulling away from the shoulder. The Andersons stopped to help the stricken officer. Another passing motorist, Jerold Burkhart, also saw the Blazer speed away. Burkhart stopped and used Borland’s radio to summon help. Borland was transported by ambulance to the Pershing General Hospital emergency room where doctors vainly attempted to stabilize him before he succumbed to a gunshot wound to the head. The Andersons and Burkhart testified that Borland’s pistol was still in its holster.
 

 On December 1, 1993, a stolen red Chevy Blazer was found abandoned in Churchill County. Shoe prints were observed leading away from the vehicle in the direction of the Clan Alpine Mountains. A helicopter reconnaissance team eventually saw what appeared to be a campfire several miles from the Blazer. A S.W.A.T. team landed, and a standoff ensued during which Sonner appeared suicidal when he raised his weapon in the direction of the officers in an attempt to draw their fire. The
 
 *1333
 
 officers fired two shots, and although Sonner was not hit, he dropped his gun and surrendered.
 

 At trial, Sonner never disputed that he killed Trooper Borland. A jury convicted Sonner of first-degree murder with use of a deadly weapon and sentenced him to death. Sonner now appeals the judgment of conviction and imposition of the death penalty.
 

 DISCUSSION
 

 Jury instruction on the authority of the board of pardons
 

 Sonner contends that the district court erred in instructing the jury that under certain circumstances and conditions the State Board of Pardons Commissioners has the power to modify sentences.
 
 [2]
 
 Sonner argues that, in his case, the instruction violated his constitutional rights to due process and a reliable sentence because it misled the jury into believing that parole was a future possibility even if it sentenced him to life without possibility of parole. We disagree.
 

 The instruction given in this case is consistent with the dictates of NRS 175.161(7)
 
 [3]
 
 and, as previously held by this court, is constitutional under both the state and federal constitutions because it does not mislead the jury.
 
 See
 
 Petrocelli v. State, 101 Nev. 46, 54-56, 692 P.2d 503, 510-11 (1985). The instruction given in this case is identical to the one set forth by this court in
 
 Petrocelli.
 
 At the time Sonner was sentenced, the instruction was an accurate statement of the law. Moreover, as we observed in
 
 Petrocelli,
 
 the United States Supreme Court has held that such an instruction “does not run afoul of constraints against arbitrary
 
 *1334
 
 and capricious sentencing patterns, and that the possibility of commutation is not too speculative of [sic] an element for the jury’s consideration.”
 
 Id.
 
 at 55, 692 P.2d at 510 (citing California v. Ramos, 463 U.S. 992 (1983)). Sonner was not prejudiced by the instruction.
 

 Although the instruction given in this case accurately represented the law at the time of Sonner’s trial, subsequent changes in the law require a modification in the
 
 Petrocelli
 
 instruction effective immediately. During the 1995 legislative session, Chapter 213 of NRS was amended to prohibit the board of pardons from commuting a sentence of death, or a sentence of life without possibility of parole, to a sentence that would allow parole. 1995 Nev. Stat., ch. 444, § 29 at 1360 (codified at NRS 213.085).
 
 [4]
 
 To comport with this change, the fourth paragraph of the
 
 Petrocelli
 
 instruction
 
 [5]
 
 should now read:
 

 Although under some limited circumstances and conditions the State Board of Pardons Commissioners has the power to modify certain sentences, the law does not allow the Board to change either a death sentence or a sentence of life without the possibility of parole to any lesser or different sentence. Therefore, you are instructed that you may not speculate as to whether the sentence you impose may be changed at a later date.
 

 
 *1335
 

 Motion to recuse t¡ie judge or disqualify the prosecutor
 

 Sonner contends that the district judge erred when he refused to disqualify the prosecuting attorney or recuse himself because of a prior attorney-client relationship between the judge and the prosecuting attorney, Brent Kolvet. Kolvet had represented the judge in an unrelated matter involving a disgruntled litigant.
 

 Sonner had the burden of presenting sufficient grounds for the judge’s recusal; and this court has always accorded substantial weight to a judge’s determination that he can fairly and impartially preside over a case.
 
 See
 
 Goldman v. Bryan, 104 Nev. 644, 649, 764 P.2d 1296, 1299 (1988). However, Sonner produced no evidence of any improper motive or instances of actual bias on the part of the district judge. Moreover, “an allegation of bias in favor or against an attorney for a litigant generally states an insufficient ground for disqualification because ‘it is not indicative of extrajudicial bias against a “party” ’. ” In re Petition to Recall Dunleavy, 104 Nev. 784, 790, 769 P.2d 1271, 1275 (1988) (quoting Gilbert v. City of Little Rock, 722 F.2d 1390, 1398 (8th Cir. 1983)).
 

 Additionally, although Judge Wagner verbally terminated the attorney-client relationship with Kolvet on January 5, 1994 — the same day Kolvet was deputized as a deputy district attorney for Pershing County — the record reflects that the attorney-client relationship effectively concluded at least 62 days before the verbal discharge on January 5th. On October 29, 1993, Kolvet sent Judge Wagner a letter indicating that the Ninth Circuit had denied rehearing to the litigant who had prompted Kolvet’s representation of Judge Wagner. This appears to be the last formal involvement that Kolvet had with Judge Wagner’s case. For these reasons, we conclude that the judge properly refused to recuse himself.
 

 Sonner also contends that Kolvet was not authorized to prosecute him because Kolvet violated state law by representing a criminal defendant while prosecuting Sonner. The argument is without merit. This court previously issued an order in the instant case concluding that because Kolvet and his firm had withdrawn from all representation of criminal defendants, Sonner’s motion to disqualify Kolvet was moot. Our order established the law of the case and impliedly acknowledged that Kolvet’s conduct had not irreparably tainted the proceedings that occurred during the conflict. The resolution of this issue posed no prejudice to Sonner.
 

 
 *1336
 

 Motion for change of venue
 

 The issue of whether to change trial venue is within the sound discretion of the trial court and will not be disturbed unless there is a clear abuse of discretion. Rogers v. State, 101 Nev. 457, 462, 705 P.2d 664, 668 (1985). Additionally, a defendant seeldng a change of venue must present evidence showing the extent of inflammatory pretrial publicity and that such publicity corrupted the trial.
 
 Id.
 

 Despite Sonner’s detailed account of media reports and statistics reflecting bias within the venire, he has utterly failed to demonstrate actual bias on the part of the jury empaneled to decide his fate. Moreover, the jurors assured the district court that they would be fair and impartial in their deliberations. This court previously has upheld the denial of motions for change of venue based upon such assurances even where pretrial publicity has been pervasive.
 
 See
 
 Ford v. State, 102 Nev. 126, 129,
 
 111
 
 P.2d 27, 30 (1986); Gallego v. State, 101 Nev. 782, 785, 798, 711 P.2d 856, 856, 859 (1985); Kaplan v. State, 96 Nev. 798, 801, 618 P.2d 354, 356 (1985).
 

 In the extensively covered “sex slave” case,
 
 Gallego,
 
 also tried in a small community, we observed:
 

 Given the realities of our age, it is unlikely that a high-profile criminal defendant will be presented with a venire of uninformed individuals from which to select a jury. Indeed, it is conceded by many jurists that such a panel would least likely provide the considered, enlightened judgment that can best serve the demands of trial.
 

 Gallego,
 
 101 Nev. at 785, 711 P.2d at 859. We also noted that extensive pretrial media coverage of high-profile criminal cases will likely penetrate every “nook and cranny” of our state capable of hosting such trials. Therefore, the real test in each case is whether jurors who may have harbored preconceived notions of guilt or innocence prior to their call to jury service, can set aside such notions and fairly and impartially render a verdict based upon the trial evidence.
 
 See id.
 
 at 785-86, 711 P.2d at 859.
 

 Because Sonner was unable to demonstrate actual prejudice resulting from pre-trial publicity, he insists that this court must
 
 presume
 
 prejudice based upon the facts of his case. The presumed prejudice standard is rarely applicable. Nebraska Press Ass’n v. Stuart, 427 U.S. 539, 554 (1976). In only one case decided by the United States Supreme Court has the Court determined that
 
 *1337
 
 prejudice must be presumed based upon pretrial publicity,
 
 see
 
 Rideau v. Louisiana, 373 U.S. 723 (1963), and there are “only a few additional cases in which relief was granted on the basis of presumed prejudice.” Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir. 1985).
 

 In
 
 Rideau,
 
 a criminal defendant’s videotaped confession of robbery, kidnapping, and murder was broadcast three times by a local television station. These broadcasts were seen by 24,000, 53,000, and 29,000 viewers, respectively, in a community of 150,000. We conclude that none of the pretrial publicity about Sonner’s case
 
 [6]
 
 rises to the level of the publicity that was presumed prejudicial in
 
 Rideau.
 
 There is simply no basis in the record for impeaching the constitutional quality of Sonner’s jury. Accordingly, this issue is without merit.
 

 Admissibility of incriminating statements
 

 Sonner contends that two incriminating statements should have been excluded from evidence. The first statement was made while Sonner was being transported to Lovelock. After having been advised of his
 
 Miranda
 
 rights, Sonner stated that Borland came to his vehicle and asked him to get out. Sonner then stated that he was not about to be taken into custody and that he had beaten Borland “to the draw.” Subsequently, Sonner was re-advised of his
 
 Miranda
 
 rights, and a police officer recorded a “rehashing” of the prior conversation. Sonner contends that the latter statement was made involuntarily.
 

 Voluntariness must be reviewed under a standard of the totality of the circumstances in the particular case. Passama v. State, 103 Nev. 212, 214, 735 P.2d 321, 323 (1987). The State has the
 
 *1338
 
 burden of proving the voluntariness of a confession by a preponderance of the evidence. Stringer v. State, 108 Nev. 413, 418, 836 P.2d 609, 612 (1992). In making this determination, the "mere examination of the confessant's state of mind can never conclude the due process inquiry." Colorado v. Connelly, 479 U.S. 157, 165 (1986). There must also be some sort of "state action" tending to exploit the confessant's mental state. Id.
 

 The record is devoid of any facts supporting Sonner's contention that he was coerced or manipulated into incriminating himself. Although he apparently was thirsty prior to arriving in Fallon, the record reveals no evidence that the police took advantage of his physical condition. See United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990) (fatigue does not automatically render a confession involuntary). In fact, the attending officer was solicitous of Sonner's comfort and properly read Sonner his Miranda rights, which Sonner voluntarily waived. Our review supports the conclusion that Sonner's statement was voluntary.
 

 Sonner also contends that a second incriminating statement, made while in jail, was involuntarily given in exchange for cigarettes. Although a jail officer refused Sonner's earlier requests for cigarettes in exchange for information, on the date that Sonner made the statement at issue he initiated the conversation and there is no evidence to indicate that he was promised cigarettes in exchange for his statement. Additionally, Sonner was again notified of his Miranda rights and told that his attorney probably would not want him to talk. Sonner nevertheless insisted on speaking.
 

 Finally, Sonner's contention that the statement was involuntary because he was suffering from substance withdrawal, is merit-less. There is nothing in the record to indicate that a possible addiction to cigarettes affected his free will as he made the statement. Therefore, we conclude that Sonner's statement while in jail was voluntary.
 

 Admissibility of autopsy photograph and trooper hat
 

 Sonner challenges the district court's admission of Trooper Borland's hat and autopsy photograph into evidence because he did not dispute that he shot Borland, and the photograph and hat assertedly proved nothing and served only to inflame the jury. We disagree. Sonner pleaded both not guilty and not guilty by reason of insanity. When a defendant pleads not guilty, he puts all the
 
 *1339
 
 elements of the offense at issue. State v. Foster, 623 P.2d 1360, 1363 (Kan. 1981);
 
 see also
 
 People v. White, 606 P.2d 847, 849 (Colo. 1980) (photographs providing proof as to matters which have been stipulated to by the defendant are not inadmissible); Sanders v. State, 96 Nev. 341, 343, 609 P.2d 324, 326 (1980) (prosecutor need not stipulate to the existence of any elements of the crime he is attempting to prove if the stipulation will impair the effectiveness of the case). We conclude that the photograph and hat were relevant for the purpose of refuting Sonner’s plea and proving the State’s case with essential facts relating to Borland’s murder.
 
 See
 
 Dearman v. State, 93 Nev. 364, 369, 566 P.2d 407, 410 (1977).
 

 NRS 48.035 provides that evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or confusing the jury. The decision to admit such evidence is within the sound discretion of the trial court. Redmen v. State, 108 Nev. 227, 231-32, 828 P.2d 395, 398 (1992). Although the photograph and the hat graphically illustrated the violence that ended Trooper Borland’s life, we conclude that they were not excessively gruesome so as to inflame the passions of the jury or unfairly prejudice Sonner’s right to a fair trial.
 
 See
 
 Clem v. State, 104 Nev. 351, 356, 760 P.2d 103, 106 (1988).
 

 Requests for psychological testing
 

 On the eve of trial, after the jury had been empaneled, Sonner moved the district court for leave to perform further testing for organic brain damage to support an insanity defense, even though prior to Sonner’s motion, he was examined by three psychiatrists. The district court denied the motion, ruling that further testing was not reasonably necessary for a proper diagnosis of organic brain damage. The court’s decision was based in part on an affidavit from a neurologist who felt that subjecting Sonner to additional tests was unnecessary because EEG’s and a BAER test taken a few days previously revealed no organic brain damage.
 

 Sonner contends that he was entitled to the requested tests under NRS 7.135
 
 [7]
 
 and that he has a due process right to prove
 
 *1340
 
 that he was insane at the time he killed Borland,
 
 see
 
 Ake v. Oklahoma, 470 U.S. 68, 82-83 (1985); Lickey v. State, 108 Nev. 191, 194, 827 P.2d 824, 828 (1992). Although Sonner was entitled to attempt to prove his theory of defense, the law does not require an unlimited expenditure of resources in an effort to find professional support for his theory. Sonner was examined by three psychiatrists; he was thus provided with a reasonable level of expert assistance.
 
 See
 
 Pertgen v. State, 105 Nev. 282, 284, 774 P.2d 429, 430-31 (1989) (“Nothing in the
 
 Ake
 
 opinion suggests that a State is constitutionally obligated to provide a defendant as many psychiatrists as it takes to come up with one who will proclaim the defendant insane at the time of his offense.”).
 

 In order to obtain testing beyond that provided by the first three psychiatrists, Sonner had to demonstrate a need for such testing.
 
 See
 
 State v. District Court, 85 Nev. 241, 244, 453 P.2d 421, 423-24 (1969). We conclude that Sonner failed to demonstrate such a need, and, moreover, the affidavit submitted in response to the motion indicated that there was no need for additional testing.
 

 Discovery of the victim’s personnel records
 

 Sonner contends that it was error to deny his motion to discover the victim’s personnel records in order to rebut State evidence of Borland’s value as a law enforcement officer and an individual. Sonner’s claim is allegedly supported by NRS 174.245,
 
 [8]
 
 Article 1 of the Nevada Constitution, the Sixth and Fourteenth Amendments to the Federal Constitution, and the
 
 Brady
 
 doctrine. Sonner is wrong.
 

 Although the State may not withhold evidence favorable to the accused and material to either guilt or sentence, the State is under no obligation to accommodate a defendant’s desire to flail about in a fishing expedition to try to find a basis for discrediting a victim.
 
 See
 
 State v. Blackwell, 845 P.2d 1017, 1021 (Wash. 1993) (“Defense counsel’s broad, unsupported claim that the police officers’ personnel files
 
 may
 
 lead to material information does not justify automatic disclosure of the documents.”). As the Washington Supreme Court observed: “A defendant must advance some factual predicate which makes it reasonably likely
 
 *1341
 
 the requested file will bear information material to his or her defense. A bare assertion that a document ‘might’ bear such fruit is insufficient.”
 
 Id.
 
 at 1022;
 
 see also
 
 People v. Gissendanner, 399 N.E.2d 924, 928 (N.Y. 1979) (“What [the decisions] do call for is the putting forth in good faith of some factual predicate which would make it reasonably likely that the file will bear such fruit and that the quest for its contents is not merely a desperate grabbing at a straw.”).
 

 Sonner’s request was based on nothing more than the assertion of a general right to search for whatever mitigating evidence might be found in Borland’s records. Sonner failed to put forth any theory of relevance beyond an unfocused general statement. For example, if Sonner had presented a foundation for believing that Borland had a reputation for being an “aggressive” trooper who, consistent with his reputation, provoked Sonner’s action, this might have been sufficient to warrant discovery of corroborating evidence in Borland’s file.
 
 See
 
 Jeffrey F. Ghent, Annotation,
 
 Accused’s Right to Discovery or Inspection of Records of Prior Complaints Against, or Similar Personnel Records of, Peace Officer Involved in the Case,
 
 86 A.L.R.3d 1170, 1175 (1978). However, the evidence supports no such theory as Borland had not even drawn his weapon when he was gunned down. The district court did not abuse its discretion in denying Sonner’s motion for discovery.
 

 Testimony during penalty phase
 

 Sonner demanded that the State produce a state-prison inmate, Billy Ray Farmer, to testify about the consequences of serving a life sentence without the possibility of parole. The district court refused, concluding that the testimony of Farmer was irrelevant. Sonner contends that this ruling violated his due process right to explain to the jury the true meaning of one of the punishments they were to consider, and violated his Eighth Amendment right to a jury capable of a reasoned moral judgment concerning its sentencing options, and whether death, rather than some lesser sentence, ought to be imposed.
 
 [9]
 

 NRS 175.552(3) provides that, during the sentencing hearing, “evidence may be presented concerning aggravating and mitigating circumstances
 
 relative to the offense, defendant or victim
 
 and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.” We conclude that the evidence was irrelevant to the sentence. Additionally, as the district court noted, both sides could probably empty
 
 *1342
 
 the prison of various people doing life without the possibility of parole, and each one would have a different concept of what that means. This highly tenuous, unsupported, and irrelevant assignment of error is simply without merit.
 

 Prosecutorial misconduct
 

 A.
 
 The guilt phase
 

 Sonner contends that the prosecutor made two comments during closing arguments
 
 [10]
 
 that constituted indirect references to his failure to take the witness stand and testify on his own behalf. He contends that a third comment
 
 [11]
 
 constituted an impermissible “law and order” appeal to join with the prosecution. Neither contention has merit.
 

 Indirect references to a defendant’s failure to testify on his own behalf are constitutionally impermissible. Burke v. Greer, 756 F.2d 1295, 1300-01 (7th Cir. 1985). However, the prosecutor in the instant case made no allusion to Sonner’s failure to testify. The prosecutor merely drew the jury’s attention to the fact that the facts of record concerning Trooper Borland’s murder were undisputed. Sonner’s trial strategy was to prove insanity, and his counsel also noted that the essential facts were not in dispute.
 
 [12]
 
 
 *1343
 
 The prosecutor’s argument was proper and did not impinge upon Sonner’s Fifth Amendment rights.
 

 Similarly, the prosecutor’s plea for justice in accordance with what the criminal justice system requires under the circumstances is not improper argument; neither does it approach in kind the impropriety found by this court in previous cases.
 
 See, e.g.,
 
 Nevius v. State, 101 Nev. 238, 248, 699 P.2d 1053, 1059 (1985) (prosecutor’s statement that the State had a “right to have the defendant convicted,” was improper); McGuire v. State, 100 Nev. 153, 158, 677 P.2d 1060, 1064 (1984) (prosecutor’s statement that the jury would have no standing to complain if they acquitted the defendant and he raped again, was improper).
 

 B.
 
 The penalty phase
 

 Sonner contends that during closing arguments at the penalty phase, the prosecutor improperly commented on Sonner’s failure to call his mother as a witness.
 
 [13]
 
 Sonner argues that the comment improperly shifted the burden of persuasion, violated due process, and constituted plain error.
 

 This court has held that generally, the State may not comment on a defendant’s failure to call a witness. Ross v. State, 106 Nev. 924, 927, 803 P.2d 1104, 1105 (1990). We have also recognized an exception to this general rule. In Colley v. State, 98 Nev. 14, 16, 639 P.2d 530, 532 (1982), this court held that it was not improper for the prosecutor to comment on the absence of a witness where the defendant testified concerning an alibi witness and thus opened the door for the prosecution to rebut that testimony with implications concerning the failure of the alibi witness to appear on the defendant’s behalf. In the instant case, defense counsel told the jury during opening argument that it would hear from Sonner’s mother, who would presumably provide the testi
 
 *1344
 
 monial support for counsel’s factual statements. Although the statement was not evidence, it did constitute factual representations to the jury that never materialized in the form of testimony by the mother.
 

 Although we need not determine whether the unfulfilled opening statement by defense counsel justified a responsive comment by the State during the penalty phase of trial, we conclude that in any event, the brief comment by the prosecutor does not require remedial action by this court. The harmless comment did not occur during the guilt phase, where the State has the exclusive burden of proving the defendant guilty beyond a reasonable doubt. During the penalty phase, the defendant has the burden of presenting mitigating evidence, if any exists.
 
 See
 
 Bishop v. State, 95 Nev. 511, 517, 597 P.2d 273, 276 (1979). Therefore, the prosecutor’s brief expression of interest in the mother’s failure to testify could not have improperly shifted the burden to the defense. This issue is without merit.
 

 Sonner’s comments to the jury
 

 Sonner contends that the district court should not have allowed him to address the jury during the penalty phase, over his counsel’s objections, and request the death penalty
 
 [14]
 
 because his statements went beyond the scope of that which is permissible.
 

 This court has recognized a defendant’s right “to stand before the sentencing authority and present an unsworn statement in mitigation of sentence, including ‘statements of remorse, apology, chagrin, or plans and hopes for the future.’ ” Homick v. State, 108 Nev. 127, 133, 825 P.2d 600, 604 (1992) (quoting DeAngelo v. Schiedler, 757 P.2d 1355, 1358 (Or. 1988)). Moreover, it has been held that this right of allocution may even be
 
 *1345
 
 used “to plead for maximum punishment in an attempt to achieve some purported good.”
 
 DeAngelo,
 
 757 P.2d at 1358.
 

 Not only was this “invited error,” but it appears that Sonner’s statements were motivated by remorse and fear as to what he might do in the future. As such, his remarks were permissible and we conclude that the district court did not err in permitting Sonner to exercise his right of allocution.
 

 Constitutionality of Nevada’s death penalty statute
 

 Sonner first insists that the aggravating factors in NRS 200.033 are vague and fail to narrow the categories of eligible defendants. This court previously has held that “[t]he clearly defined, statutorily required, aggravating circumstances that must be found to exist beyond a reasonable doubt serve to narrow and confine the class of persons against whom the death penalty may apply.” Gallego v. State, 101 Nev. 782, 791, 711 P.2d 856, 862 (1985). Sonner has not provided additional or more persuasive arguments to convince this court to overrule
 
 Gallego.
 

 Second, Sonner contends that the use of unspecified, nonstatu-tory aggravating circumstances without instructing the jury as to what is or is not an appropriate aggravating circumstance, renders Nevada’s death penalty statute unconstitutionally vague, fails to channel the jury’s discretion, and results in cruel and unusual punishment. We disagree.
 

 Under NRS 175.552, evidence may be presented on “any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.” This court has held that NRS 175.552 “is not limited to those nine aggravating circumstances outlined in NRS 200.033.” Allen v. State, 99 Nev. 485, 488, 665 P.2d 238, 240 (1983). Additionally, in
 
 Gallego
 
 we held that “[wjhether such additional evidence will be admitted is a determination reposited in the sound discretion of the trial judge.” 101 Nev. at 791, 711 P.2d at 863. More importantly, however, as noted in
 
 Gallego,
 
 it is only
 
 after
 
 a jury has found the existence of
 
 statutorily defined
 
 aggravating circumstances beyond a reasonable doubt, that a jury may hear and consider other aggravating (and mitigating) evidence that is “relevant to the life of a defendant as a whole person.”
 
 Id.
 
 at 791, 711 P.2d at 862. Based on these prior decisions, we conclude that it was not improper for the district court to allow the jury to consider evidence outside the categories listed in NRS 200.033.
 

 Third, Sonner contends that the death penalty is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Federal Constitution and Article 1, Section 6
 
 *1346
 
 of the Nevada Constitution. This court previously has upheld the constitutionality of the death penalty. Bishop v. State, 95 Nev. 511, 517-18, 597 P.2d 273, 276-77 (1979). Sonner has offered nothing to convince us to do otherwise.
 

 Mandatory review of propriety of death penalty
 

 NRS 177.055(2)
 
 [15]
 
 mandates the review of every death sentence by this court. In conformity with the statutory requirements, and in addition to the issues raised by Sonner and resolved as herein-before discussed, we have determined that each of the aggravating circumstances found by the jury was supported by substantial evidence. Specifically, the record substantially reveals that Sonner (1) killed a law enforcement officer engaged in official duties; (2) committed murder to prevent lawful arrest; (3) & (4) previously was convicted of two distinct crimes of violence; and (5) committed murder while under sentence of imprisonment.
 

 Moreover, our careful review of the record has revealed no evidence indicating that Sonner’s death sentence was imposed under the influence of passion, prejudice or any arbitrary factor. We therefore hold that the death sentence was not imposed under the influence of any such factors.
 

 Finally, having fully considered Sonner as a person, and the gravity and circumstances of his crime, we have concluded that the death sentence he has received is not excessive.
 

 CONCLUSION
 

 For the reasons discussed above, we conclude that Sonner was fairly tried, convicted and sentenced. Accordingly, we affirm the judgment entered by the district court in all respects, including the sentence of death.
 

 [1]
 

 Although appellant has indicated that he is also appealing from judgments of conviction on one count of being an ex-felon in possession of a firearm, one count of possession of a stolen vehicle, and one count of resisting a public officer, appellant has failed to address any of these counts in his briefs and argument on appeal. We therefore consider these issues abandoned and will not address them in this opinion.
 

 [2]
 

 The district court instructed the jury as follows:
 

 Instruction No. 23. Life imprisonment with the possibility of parole is a sentence to life imprisonment which provides that the defendant would be eligible for parole after a period of 10 years. This does not mean that he would be paroled after ten years but only that he would be eligible after that period of time.
 

 Life imprisonment without the possibility of parole means exactly what it says, that the defendant shall not be eligible for parole.
 

 If you sentence the defendant to death you must assume that the sentence will be carried out.
 

 Although under certain circumstances and conditions the State Board of Pardons Commissioners has the power to modify sentences, you are instructed that you may not speculate as to whether the sentence you impose may or may not be changed at a later date.
 

 [3]
 

 NRS 175.161(7) provided at the time of Sonner’s trial that, upon request of either party, the jury must be informed that in cases where life without possibility of parole is a possible penalty, “such penalty does not exclude executive clemency.”
 

 [4]
 

 The amendment added a new section to chapter 213, which reads as follows:
 

 1. If a person is convicted of murder of the first degree before, on or after July 1, 1995, the board shall not commute:
 

 (a) A sentence of death; or
 

 (b) A sentence of imprisonment in the state prison for life without the possibility of parole,
 

 to a sentence that would allow parole.
 

 2. If a person is convicted of any crime other than murder of the first degree on or after July 1, 1995, the board shall not commute:
 

 (a) A sentence of death; or
 

 (b) A sentence of imprisonment in the state prison for life without the possibility of parole,
 

 to a sentence that would allow parole.
 

 NRS 213.085.
 

 [5]
 

 The fourth paragraph currently reads:
 

 Although under certain circumstances and conditions the State Board of Pardons Commissioners has the power to modify sentences, you are instructed that you may not speculate as to whether the sentence you impose may be changed at a later date.
 

 Petrocelli,
 
 101 Nev. at 56, 692 P.2d at 511.
 

 [6]
 

 A number of newspaper articles detailed the financial impact of the case on Pershing County; the impact on the victim’s family; posthumous honors awarded to the victim; facts adduced at the preliminary hearing, including details of the shooting, ensuing manhunt and arrest, as well as the statement: “When in custody, Sonner confessed to a Nevada Division of Investigation’s officer that he had shot Borland;” “attempts” by defense counsel to make sanity an issue; the process and results of evaluations to determine whether Sonner was competent to stand trial; admissions by Sonner concerning other killings; details regarding the nature and extent of police investigation and evidence testing; photographs, including the crime scene, the victim’s grieving parents and a memorial site at the location of the alleged shooting; the victim’s funeral; Sonner’s criminal history, including alleged prison escapes; evaluations of whether Sonner would be able to escape from Pershing County Jail; references to Sonner’s efforts to obtain extraordinary relief and a stay in the trial; references to the start and continuation of efforts to select the jury; characterizations of Sonner as “judge, jury and executioner”; and several letters to the editor, one of which characterized Sonner as “the little maggot”; and numerous broadcasts in the electronic media.
 

 [7]
 

 NRS 7.135 provides:
 

 The attorney or attorneys appointed by a magistrate or district court to represent a defendant are entitled, in addition to the fee provided by law for their service, to be reimbursed for expenses reasonably incurred by him or them in representing the defendant and may employ, subject to the prior approval of the magistrate or district court in an ex parte application, such investigative, expert or other services as may be necessary for an adequate defense.
 

 [8]
 

 NRS 174.245 provides:
 

 Upon motion of a defendant the court may order the district attorney to permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the state, upon a showing of materiality to the preparation of his defense and that the request is reasonable.
 

 [9]
 

 Sonner provides no legal authority to support these contentions.
 

 [10]
 

 The prosecutor stated:
 

 That’s what occurred on the 30th; facts that are not in dispute in this case. There’s been no contradiction of that as being the facts that happened on the 30th.
 

 The prosecutor continued:
 

 What the defense argues in this case are the experts. You did not hear them argue the facts. You did not hear them apply the facts that occurred when Carlos Borland was shot and murdered. The reason is because the facts clearly do not add up to what they want you to believe.
 

 [11]
 

 The prosecutor remarked in conclusion:
 

 We would ask again that you return the verdicts that we’ve requested of guilty on all counts, including the count of first degree murder in this case.
 

 We ask that the tragedy that’s before you not be compounded and that the verdicts reflect the justice that the system requires.
 

 [12]
 

 Sonner’s counsel argued:
 

 In this case the burden of proof is on the defense to show that Mr. Sonner was insane under the law at the time that he shot Officer Borland, and we have never disputed any of the allegations about the facts of the criminal charges. We have come into court and presented substantial evidence that he was insane.
 

 The State brought in a parade of witnesses to prove what the defense
 
 *1343
 
 didn’t dispute; and that is the possession of the gun, the car, the shooting and to show you the location of the fires and footsteps and everything else ....
 

 [13]
 

 During opening statements, Sonner’s counsel stated:
 

 You’ll also hear for the first time from Michael’s natural mother, Phyllis, a woman who raised — if you want to call it that — Michael for the first three years of his life, who turned Michael over to his father and basically who had little or any contact over the guidance of Michael following that.
 

 During closing arguments, the prosecutor made the following comment:
 

 What is interesting in part is that they had told you at the start of that process that they were going to have the mother of Mr. Sonner testify but she didn’t appear. I don’t know why, but it’s interesting that she didn’t take the stand and testify in this case.
 

 [14]
 

 Sonner made the following statement to the jury:
 

 First, I would like to let the jury know that I have caused a lot of heartache and pain and death; also, to the families and you, my family, I am deeply sorry for all the pain that I have — that they have gone through.
 

 I know that I have caused and done wrong, but I feel there is — there were problems in my head. The psychiatrists, Dr. Foster and Dr. Rosenthal, said or stated that they felt that I had some mental problems. I did not give my lawyers much of a way to work with this case, except for a plea of insanity, and since I am in fact found guilty.
 

 People need a little lovin’, and God it’s sad all the hell that they have to go through to find some.
 

 I would also like to let you know the pain and anguish in my past and present mind. Ever since it has been getting worse and I know I can’t control it, and I would ask you to put me out of my misery.
 

 [15]
 

 NRS 177.055(2) provides:
 

 2. Whether or not the defendant or his counsel affirmatively waives the appeal, the sentence must be reviewed on the record by the supreme court, which shall consider, in a single proceeding if an appeal is taken:
 

 (a) Any errors enumerated by way of appeal;
 

 (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
 

 (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
 

 (d) Whether the sentence of death is excessive, considering both the crime and the defendant.