**UNITED STATES of America**

v.

**Leona M. HELMSLEY, Defendant.**

**No. 88 Cr. 219 (JMW).**

United States District Court,
S.D. New York.

March 27, 1991.

See also 733 F.Supp. 600.

Cathy Seibel, Asst. U.S. Atty., and Roger Hayes, Acting U.S. Atty., S.D.N.Y., New York City, for U.S.

Alan M. Dershowitz Cambridge, Mass., Nathan Z. Dershowitz, Dershowitz & Eiger, New York City, Sandor Frankel, Bender & Frankel, New York City, and Andrew Good and Harvey Silverglate, Silverglate & Good, Boston, Mass., for defendant.

## MEMORANDUM OF LAW

WALKER, Circuit Judge.[1]

Defendant Leona M. Helmsley moves to disqualify this judge from ruling on her motion for a new trial pursuant to Fed.R. Crim.P. 33. She argues, in substance, that hostility and antagonism demonstrated toward me by her lawyer prior to his representation of her makes it questionable whether I can act impartially in her case. Helmsley contends that my recusal is required under 28 U.S.C. § 455(a) and Canon 3 C(1) of the American Bar Association Code of Judicial Conduct.

### Background

From June 26, 1989 to August 30, 1989, I presided over the criminal trial of Helmsley and two co-defendants. The jury found Helmsley guilty on thirty-three counts of tax evasion, filing false tax returns and mail fraud. On December 12, 1989, I imposed a sentence that included a term of imprisonment of four years and fines exceeding $7 million. Throughout the pre-trial, trial, post-trial and sentencing proceedings, Helmsley was represented by Gerald A. Feffer, Esq. and Williams & Connolly. Shortly after sentencing, Heimsley retained Alan M. Dershowitz, Esq. for her appeal and subsequent proceedings.

During the immediately preceding months, Mr. Dershowitz had been engaged in a public campaign in opposition to my nomination to the United States Court of Appeals for the Second Circuit. After I was nominated in September 1989, Mr. Der-

1. Sitting in District Court by designation.

showitz expressed his criticisms in newspapers columns, a letter to the New York Law Journal and interviews given to newspaper and magazine reporters. On November 7, 1989, at the Senate Judiciary Committee's confirmation hearing, Mr. Dershowitz asked to appear and testified in opposition to my appointment. The Judiciary Committee and the Senate voted unanimously to confirm my appointment and I was sworn in as a judge of the Court of Appeals on December 19, 1989.

In April 1990, Helmsley's co-defendants filed motions in the District Court to reduce their sentences. In so doing, they requested that Chief Judge Brieant assign their motions to me. Chief Judge Brieant asked me whether I was willing to resume handling the matter in the District Court. I agreed and the motions were then assigned to me.

On October 10, 1990, while her appeal from conviction was *sub judice* in the Court of Appeals, Helmsley filed a motion for a new trial pursuant to Rule 33 in the District Court. With her motion, she submitted a stipulation substituting Mr. Dershowitz and his colleagues for Mr. Feffer and Williams and Connolly as well as a motion to permit their appearance *pro hac vice*. The stipulation of substitution was "so ordered" before Judge Duffy in Part I. On October 10, 1990, Chief Judge Brieant asked me whether I would handle the new trial motion. I agreed to do so. On October 11, 1990, Chief Judge Brieant granted the *pro hac vice* motion and referred the motion for a new trial to me. Apparently, copies of Chief Judge Brieant's order of referral were not forwarded by his chambers to counsel for either side.

On December 13, 1990, at a conference, Helmsley, through Mr. Dershowitz, suggested that I recuse myself from the matter. While I concluded that nothing said at the conference seemed to warrant recusal, I set a schedule for the submission of motion papers. This motion followed.

### Discussion

Section 455(a) provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

Helmsley argues that events surrounding her attorney's criticisms of me and his public opposition to my appointment to the Court of Appeals give rise to an appearance of bias on my part that requires my disqualification.

Helmsley does not contend that I *in fact* harbor bias, or will be motivated to rule against her out of resentment for her attorney's antagonism. Despite the absence of an allegation of actual bias, I address the question because I would recuse myself even in the absence of a motion if I believed I would have difficulty ruling impartially. In fact, I have no bias toward Helmsley or toward the conduct of her litigation through Mr. Dershowitz. I can perceive no danger that I would be influenced in any ruling by any feelings about Mr. Dershowitz or reaction to his conduct toward me.

■ In this regard I note two points. First, although it is never pleasant to be criticized, Mr. Dershowitz's opposition was not of major significance for me. He was alone in expressing opposition to my appointment.[2] There was no indication that any of the Senators who needed to pass on my confirmation gave any credence to his criticisms, which were consistent with his longstanding, widely known practice of criticizing judges.[3] It appeared from one Senator's questioning that his criticisms may have been seen as motivated by a

---

**2.** At the Senate hearing, Senator Simpson noted:

"Apparently, there is only one real thorough objection to you. I have heard that criticism that came from a single person, but I have not heard that echoed by any other member of the committee. And I would not think that your nomination would be controversial."

**3.** At a conference on December 13, 1990, Mr. Dershowitz stated: "Your honor, when I criticize judges as I have done—you are not the first nor will you be the last—I feel an obligation to—because of my teaching and my academic interest and other interests in taking an active role in criticizing judicial appointments. This is not the first time this has occurred." T. 9.A.

ruling I had made in a matter in which he was interested. *See* Part B, *infra* n. 5.

I therefore never regarded Mr. Dershowitz's hostile campaign as a cause for any concern. I did not feel that it required a response, and, apart from brief and neutral responses to a few Senators' questions at the hearing, I did not address or respond to his criticisms. In short, Mr. Dershowitz's attacks and criticisms have not been an important preoccupation for me.

■ Secondly, it is not at all unusual, given the combative nature of litigation for a judge to have an attorney before him with whom the judge has had prior acerbic relations. It is one of the earliest and most fundamental lessons of judging that a judge must rule on the merits without regard to the personality of the attorney or any unpleasant experiences the judge may have had with the attorney in the past. In fact, it is a standard part of a judge's instructions to the jury that any predisposition toward or against any attorney must be set aside in reaching a verdict. Jurors are directed to follow this instruction; judges follow it as a matter of course.

Thus, I have no reason whatsoever to question my ability to rule with impartiality on Mrs. Helmsley's motion. Whether she is represented by Mr. Dershowitz or any other lawyer, my ruling would be based on the merits. I therefore move on to Helmsley's contentions as to the *appearance* of partiality under § 455(a).

■ Section 455(a) is designed to "promote public confidence in the impartiality of the judiciary by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality he should disqualify himself." H.R.Rep. No. 93–1453, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 6351, 6355 ("House Report"). Section 455(a) was designed to abolish the so-called "duty-to-sit" rule, whereby a judge faced with close recusal questions was required to resolve them in favor of remaining on the case. *See generally* 13A Wright, Miller & Cooper, Federal Practice and Procedure § 3549, at 609–12 (2d ed. 1984). The test under § 455(a) therefore turns not only on

whether the judge is actually biased or impartial, but also on whether to a reasonable observer the judge's impartiality would be open to question. Moreover, the reasonable observer is assumed to be possessed of all of the relevant facts and circumstances bearing on the question. *See In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1313 (2d Cir.1988), *cert. denied,* 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989); *Gilbert v. City of Little Rock,* 722 F.2d 1390, 1399 (8th Cir.1983) *cert. denied,* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984).

Section 455(a) as presently drafted was amended in 1974 to conform to Canon 3 C(1) of the ABA Code of Judicial Conduct. See *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 858 n. 7, 108 S.Ct. 2194, 2201 n. 7, 100 L.Ed.2d 855 (1988). Canon 3 C(1) provides in pertinent part as follows:

> A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
> (a) he has a personal bias or prejudice concerning a party ...

In amending § 455(a), however, Congress warned of a potential for abuse:

> [I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

House Report at 6355 (emphasis in original).

The potential for abuse by the litigant who desires to disqualify a judge because

he fears an unwelcome decision by the judge on the merits was recognized by the Second Circuit in *In re Drexel Burnham Lambert*, 861 F.2d at 1313. The court stated that, when deciding a recusal motion, "the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." *Id.* at 1312 (citing *In re United States*, 666 F.2d 690, 695 (1st Cir.1981)).

The court added that "[a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is" and explained that "[l]itigants are entitled to an unbiased judge; not to a judge of their choosing." *Id.* The court cautioned that recusal is not warranted for reasons that are "remote, contingent, or speculative." *Id.* at 1313. Where such is the case, "the price of avoiding any hint of impropriety, no matter how evanescent, would grant litigants the power to veto the assignment of judges" and "would carry a worthy policy too far." *Id.* at 1315. In *United States v. Greenough*, 782 F.2d 1556 (11th Cir.1986), the court stated that while "courts must not only be, but must seem to be, free of bias or prejudice," after a judge is assigned to a case, he "should not recuse himself on unsupported, irrational, or highly tenuous speculation" lest "the price of maintaining ... the appearance of justice ... be the power of litigants or third parties to exercise a veto over the assignment of judges." *Id.* at 1558. The pertinence of these considerations is heightened when a disqualification motion is made in a litigation that is not new, but has advanced considerably before the judge in question.

For all these reasons, courts have drawn a sharp distinction between alleged hostility between judge and party and alleged hostility between judge and attorney. Except in "extreme" and "rare" cases, see *Panzardi–Alvarez v. United States*, 879 F.2d 975, 984 (1st Cir.1989); *cert. denied*, —— U.S. ——, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990), the appearance of hostility on the part of the judge *toward an attorney* has been ruled an insufficient basis for

recusal. *See In re Cooper*, 821 F.2d 833, 838–39, 841 (1st Cir.1987); *In re Beard*, 811 F.2d 818, 830 (4th Cir.1987); *Moore v. McGraw Edison Co.*, 804 F.2d 1026, 1032 (8th Cir.1986); *United States v. Burt*, 765 F.2d 1364, 1368 (9th Cir.1985); *Gilbert v. Little Rock*, 722 F.2d at 1398–99; *United States v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir.1982); *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1052 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *see also In re Drexel*, 861 F.2d at 1314, 1316 (under § 455(b)(1), bias against lawyer is not bias against client); *In re IBM Corp.*, 618 F.2d 923, 932 (2d Cir.1980) (no basis for finding prejudice against party, as distinct from counsel); *United States v. Wolfson*, 558 F.2d 59, 63 n. 12 (2d Cir.1977) (friction between court and counsel not indicative of bias toward defendant). Courts have ruled that the appearance of judicial hostility or favoritism must be *toward a party* to warrant recusal. Thus, where a judge had disparaged an attorney's testimony, called him an "untrustworthy manipulator, called his partner a "name dropper" and described their conduct as "dirty work," recusal was not called for because even such an attitude toward *the attorney* did not reasonably call into question the judge's ability to rule impartially as to the attorney's client. *In re Cooper*, 821 F.2d at 841. *See also United States v. Burt*, 765 F.2d at 1368 (judge's openly disparaging treatment of attorney did not justify recusal without evidence of bias toward party).

## A. *Mr. Dershowitz's Opposition to My Nomination*

Where the issue is not hostility displayed *by the judge*, but hostility displayed *toward the judge*, the Second Circuit has found that hostile attacks even by a criminal defendant, much less by the defendant's lawyer, are not a sufficient basis for recusal. In *King v. United States*, 576 F.2d 432 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978), the court stated that a litigant's letter which cast aspersions upon the motivations and intent of Judge MacMahon "may very well

establish King's feelings toward Judge MacMahon, but has no tendency to show the latter's feelings toward King." *Id.* at 437. Similarly, in *United States v. Wolfson*, 558 F.2d at 59, a defendant's hostile telegram to the judge and a letter to the New York Times, not published but copied to the judge, accusing the judge of participating in a " 'scheme to frame' " him, were held to "only establish Wolfson's feelings toward Judge Palmieri, not the reverse." *Id.* at 61, 62 (citation omitted). The fact that a considerable amount of publicity attended Mr. Dershowitz's criticisms does not alter this standard. If the rule were otherwise, "litigants fortunate enough to have easy access to the media could make charges that would effectively veto the assignment of judges." *In re Drexel Burnham Lambert, Inc.,* 861 F.2d at 1309 (recusal inquiry may not be defined by what appears in the press).

If a party's criticisms of a judge do not require recusal, then certainly an attorney's criticisms of a judge do not. If this were not so, the possibilities of abuse would be manifest. A party wishing to rid himself of the assigned judge would need only hire a lawyer with a certified record of abusive criticisms of that judge. Lawyers who preferred not to appear before selected judges in the future could guarantee that result by publicly criticizing them.

In this case, I conclude that Mr. Dershowitz's criticisms of me do not require my disqualification. In the first place, contrary to Helmsley's contention, I never participated in any conflict or expression of hostility. Helmsley's papers suggest that Mr. Dershowitz and I traded blows. To the contrary, only one person was doing the fighting. I neither criticized Mr. Dershowitz, nor questioned his right to voice opposition, nor replied to his criticisms. Second,

notwithstanding Mr. Dershowitz's ability to get his criticisms into print, they remained inconsequential. There was no publicly expressed support for his position. I am not aware of any communication received by the Judiciary Committee, other than his, in opposition to my nomination. It appears that no Senator gave importance to Mr. Dershowitz's campaign. The outcome of the nomination was unaffected.

On all the circumstances, and given the well established judicial rejection of a rule that would permit a litigant or an attorney to disqualify a judge by criticizing him, I find no circumstances arising from Mr. Dershowitz's opposition to my nomination that require my disqualification under § 455(a).

### B. *The von Bulow Litigation*

■ Helmsley contends that recusal under § 455(a) is required by my rulings and actions in the *von Bulow* litigation in 1986 and 1987. *von Bulow by Auersperg v. von Bulow,* 657 F.Supp. 1134 (S.D.N.Y.1987); *see* 114 F.R.D. 71 (S.D.N.Y.1987).[4]

In the *von Bulow* matter, Mr. Dershowitz, formerly an attorney for the defendant Claus von Bulow in another litigation, was a witness. An issue arose as to whether the circumstances surrounding the publication of his book, *Reversal of Fortune,* resulted in a waiver of Claus von Bulow's attorney-client privilege.

Helmsley contends that my rulings on the attorney-client issue, on the scheduling of discovery and other matters demonstrated bias against Mr. Dershowitz. This is a far-fetched argument. It is correct that there were rulings unfavorable to Mr. Dershowitz, including, as Mr. Dershowitz has noted, my 1987 ruling on the issue of attorney-client privilege.[5] Others were favor-

---

**4.** After Helmsley advanced this claim in her reply papers, the government responded by letter dated March 15, 1991, noting that while it has no right of sur-reply, it will submit one, if requested by the Court since it "takes issue with virtually every allegation in Helmsley's motion." This will not be necessary. The letter will be made a part of the record, as will a letter dated March 19, 1991, from Nathan Dershowitz, Esq. in response to the government's letter.

**5.** At a conference on December 13, 1990, Mr. Dershowitz read from my Senate testimony referring to the *von Bulow* case, in which I described him as "a person who had an interest in the matter before me and the ruling that I gave was not in that person's favor." Mr. Dershowitz stated, "That's an accurate description...." (T. 6).

able to him, such as, if recollection serves, accommodating his request that continued deposition sessions be conducted in Massachusetts where he resides. The contention that these rulings demonstrate bias against Mr. Dershowitz, or would ever be perceived as such, is outlandish.

Precisely to avoid such far-fetched claims, courts have consistently ruled that claims of prejudice and disqualification may not, ordinarily, be based on a judge's rulings. *See, e.g., In re Cooper,* 821 F.2d at 841; *In re IBM,* 618 F.2d at 929–31; *United States v. Wolfson,* 558 F.2d at 63, n. 12. It is part of a judge's job to make rulings. Every ruling of necessity disfavors someone. If those affected by rulings in the normal course of litigation—be they parties, attorneys or witnesses—could seek disqualification because a judge's rulings disfavored them, our system of justice would become difficult, if not impossible, to administer.

■ In an imaginative effort to avoid this rule, Helmsley claims that my alleged bias, demonstrated by rulings in *von Bulow,* stem from an *extrajudicial* source. In 1982, Mr. Dershowitz wrote a book entitled *The Best Defense* in which he criticized certain prosecutors in the United States Attorney's office for this district. I had worked in that office as an Assistant U.S. Attorney from 1970 to 1975. I was not mentioned in the book. Helmsley nonetheless claims that a reasonable observer would believe that I would so resent Mr. Dershowitz's 1982 criticism of prosecutors I worked with in 1975 that it would now cause me to make biased rulings against Mrs. Helmsley in 1991. This far-fetched notion is simply too "remote, contingent [and] speculative" to support a claim of apparent bias under § 455(a). *In re Drexel Burnham Lambert, Inc.,* 861 F.2d at 1313.

As noted above, even if bias or apparent bias against Mr. Dershowitz in present or past proceedings could be shown, courts have consistently held that to require recusal, judicial bias must be against a *party,* not the party's counsel. *See, e.g., In re Cooper,* 821 F.2d at 838–839; *In re Drexel, Burnham, Lambert, Inc.,* 861 F.2d at

1314, 1316; *In re IBM,* 618 F.2d at 932; *United States v. Wolfson,* 558 F.2d at 63 n. 12.

■ The next asserted ground is Helmsley's claim that at a judicial conference in September 1986, during the *von Bulow* litigation at which I presided, I had an *ex parte* conversation with Michael Armstrong, Esq. attorney for plaintiffs in that case, in which I told him that, in sum and substance, I intended to give Mr. Dershowitz a "hard time" as a witness in a hearing because of what he had written in *The Best Defense.* No such conversation ever took place.

The only support offered is Mr. Dershowitz's assertion by affidavit that Mr. Armstrong told him so in 1987 during a break in his deposition in the *von Bulow* matter. This is inconsistent with other versions that Mr. Dershowitz told the press: that his source was an unnamed friend of a friend who told him about it either shortly after the supposed conversation occurred or, in another version, several months later. An affidavit by Mr. Dershowitz's brother and co-counsel Nathan Dershowitz, Esq. asserts that he was present when Mr. Armstrong spoke of having had a conversation with me, but he does not state any content of the supposed conversation. Meanwhile, I have stated under oath that no such conversation occurred. Mr. Armstrong certifies by affidavit that the conversation did not take place and that he never told Mr. Dershowitz any such thing. An associate of Mr. Armstrong (Mr. Parnon), who all agree was present at the deposition, states in his affidavit that Mr. Armstrong said no such thing to Mr. Dershowitz.

In sum, no such conversation occurred, and Helmsley's submissions do not support a reasonable inference otherwise. But even assuming that in 1986 a judge had had such a conversation about a lawyer or witness involved in a matter before him, it would not support a reasonable inference that the judge would be partial in an unrelated case nearly five years later in which the attorney appeared. For the reasons given above, as a matter of law, even if this allegation were true, it would not

justify my disqualification in the *Helmsley* case.

### C. *Ex Parte Communication in the Helmsley Case*

 Finally, Helmsley contends that my fairness can reasonably be questioned because of a telephone call made by my clerk to the Assistant U.S. Attorney in the Helmsley matter. The contention is frivolous.

When Helmsley made her motion for a new trial and it had been assigned to me by the Chief Judge of the District Court, my law clerk telephoned the Assistant U.S. Attorney and suggested that the Assistant write a letter proposing a schedule for the submission of papers on the motion. Helmsley asserts that this was an *ex parte* communication and that it evidences partiality, bias and unfairness. Helmsley speculates that the clerk would not have made such a call without my being aware of it. This much is quite true. I indeed instructed my clerk to make the call. The proposition that the event suggests bias, however, is ridiculous.

Where scheduling is involved, it is commonplace for trial judges to have their clerks telephone counsel from one side requesting either that he initiate discussion with the adversary over a schedule for submissions or that he write a letter setting forth a proposal for scheduling. Such a call would not involve discussion of the merits or of any issue in the case; furthermore, it is not made by the judge. It serves only to set in motion an exchange of proposals for a schedule. It is routine court practice in case management.

The further suggestion that sinister implications arise from the fact that Helmsley's counsel did not receive notice from the Chief Judge of the order assigning Helmsley's new trial motion to me is even more strained. As noted above, the post-sentence motions of Helmsley's co-defendants had been assigned to me months before. It is usual procedure for the new trial motion to go to the judge who presided at trial because this avoids requiring another judge to familiarize himself with the trial record. The only unusual feature here was that in the meantime, I had become a judge of the Court of Appeals. I nonetheless accepted the assignment when this was suggested by the Chief Judge of the District Court. The fact that the Chief Judge's staff did not send notice of the order of reassignment to counsel for either side was apparently nothing more than an administrative oversight. I knew nothing about it. In any event, the capacity of these events to suggest bias on my part is non-existent.

### Conclusion

I find no basis to disqualify myself for either actual bias or the appearance of partiality. The motion is denied.

SO ORDERED.