CITY OF LAS VEGAS DOWNTOWN REDEVELOPMENT AGENCY, Appellant, v. JACOB CHIC HECHT, as Trustee of JACOB CHIC HECHT Revocable Living Trust, CECELIA HECHT APPELBAUM, JUAN DEL PRADO dba WORLD MERCHANTS IMPORTERS, LAWYERS TITLE OF LAS VEGAS, INC., NEVADA STATE BANK, CITY OF LAS VEGAS, a Municipal Corporation, Clark County, MARTIN D. HECHT, as Trustee Under the MARTIN D. HECHT Revocable Living Trust Dated September 5, 1989, DONALD HECHT, JACOB HECHT, KEVIN MURPHY dba MICHAEL MENS FASHION, CECELIA APPELBAUM, Trustee in Trust Under the APPELBAUM Family Trust, Dated October 20, 1989, Respondents.

No. 27942

June 3, 1997                    940 P.2d 134

*Bradford Jerbic,* City Attorney, Las Vegas; *Beckley, Singleton, Jemison & List* and *Daniel F. Polsenberg,* Las Vegas; *McDonough, Holland & Allen* and *Mark A. Wasser,* Sacramento, California, for Appellant.

*Kermitt L. Waters* and *Laura Wightman FitzSimmons,* Las Vegas, for Respondents.

*Chet Adams,* City Attorney, Sparks; *Shauna M. Hughes,* City Attorney, Henderson; *Richard C. Maurer,* City Attorney, North Las Vegas; *Noel S. Waters,* District Attorney, Carson City, for Amicus Curiae City Redevelopment Agencies.

*Lionel Sawyer & Collins,* Las Vegas, for Amicus Curiae The Fremont Street Experience.

# OPINION

By the Court, YOUNG, J.:

Respondents Jacob Chic Hecht, as Trustee of the Jacob Chic Hecht Revocable Living Trust; Martin D. Hecht, as Trustee under the Martin D. Hecht Revocable Living Trust dated September 5, 1989; Cecelia Appelbaum, Trustee in Trust under the Appelbaum Family Trust dated October 10, 1989; Cecelia Hecht Appelbaum, Donald Hecht, and Jacob Hecht (collectively "Hecht") have moved to disqualify JUSTICE ROBERT E. ROSE based upon his alleged animosity toward their attorney, Laura FitzSimmons ("FitzSimmons"), and because this condemnation action is gaming related and JUSTICE ROSE is disqualified pursuant to Regulation 12 of the Nevada gaming regulations from participating in gaming related cases. We conclude that Hecht has not made a sufficient showing of bias to meet the burden of proof necessary to disqualify a judge or justice and that neither the subject matter of this condemnation case nor the debt owed JUSTICE ROSE by a gaming entity requires his disqualification.

## FACTS

Hecht and FitzSimmons claim that JUSTICE ROSE should be disqualified from hearing this or any other case where FitzSimmons is the attorney for a party because statements made by JUSTICE ROSE show that he has an express or implied bias against her. Hecht has cited numerous instances where JUSTICE ROSE has commented on the action taken by FitzSimmons or what JUSTICE ROSE believed was action taken by FitzSimmons' close friend, former JUSTICE ELMER GUNDERSON. The first statements made by JUSTICE ROSE were in the controversial *Whitehead v. Nevada Commission on Judicial Discipline* case, and FitzSimmons was one of the attorneys for Whitehead. FitzSimmons delivered a letter to JUSTICE ROSE demanding he recuse himself from the case because the Attorney General had reviewed a report alleging misconduct by JUSTICE ROSE and the

Attorney General agreed with the Clark County District Attorney that the complaint against JUSTICE ROSE had no merit. JUSTICE ROSE had stated that he believed former JUSTICE ELMER GUNDERSON and some of the *Whitehead* attorneys had made public information that was the basis of the misconduct claim against JUSTICE ROSE.

Nineteen ninety-four was an election year for JUSTICE ROSE, and FitzSimmons supported his opponent and worked in the opponent's campaign office. She also arranged a press conference where statements were made by former U.S. Attorney Bill Maddox that were detrimental to JUSTICE ROSE's campaign. During these political campaign exchanges, JUSTICE ROSE cited FitzSimmons' activity as evidence that she opposed his re-election. While most of the comments made by JUSTICE ROSE were factually based, a few comments were apparently based on what JUSTICE ROSE had been informed FitzSimmons was doing against him.

After JUSTICE ROSE won the 1994 election, FitzSimmons filed a lawsuit to make public any telephone conversations between JUSTICE ROSE and third parties that had previously been sealed by the district court. FitzSimmons stated that the purpose of the request was so that she could use the statements in a legal action against JUSTICE ROSE; however, FitzSimmons gave neither JUSTICE ROSE nor the other third parties to the conversations notice of the petition or hearing. When JUSTICE ROSE and the third parties became aware of the action through sources other than FitzSimmons, they opposed it; and FitzSimmons did not pursue it further.

Hecht also claims that this condemnation action is part of a project to improve downtown Las Vegas and make Fremont Street and the fronting gaming casinos more attractive to tourists. As such, Hecht claims that the case involves "gaming," even though no gaming was or will be conducted on the condemned property. JUSTICE ROSE holds a promissory note from individuals who own a bar in which gaming is conducted and which is located fifteen miles from downtown Las Vegas. Since the note is secured by a deed of trust on the property where gaming is conducted and the stock owned by the individuals is pledged to secure payment of the note to JUSTICE ROSE, Hecht asserts that JUSTICE ROSE has a financial interest in the note's repayment, which constitutes an interest in gaming.

JUSTICE ROSE has filed a response to the motion to disqualify stating that he has no implied or express malice toward FitzSimmons that would prevent him from sitting in a fair and impartial manner on cases where she is the attorney of record. JUSTICE ROSE also asserts that FitzSimmons has waived any

disqualification claim against him. Since the inception of the alleged bias, JUSTICE ROSE avers that FitzSimmons and her clients have not consistently moved to disqualify him and that this waives any disqualification claim asserted on that basis. Specifically, JUSTICE ROSE states that FitzSimmons has been counsel of record in eighteen cases that were decided or are pending before the Nevada Supreme Court since the *Whitehead* case (the time which FitzSimmons claims JUSTICE ROSE's bias against her began) and that she has filed a formal demand to disqualify him in only half of them. Of the nine cases where FitzSimmons and her client did not move to disqualify JUSTICE ROSE, JUSTICE ROSE apparently voted in favor of FitzSimmons' clients five out of eight times, with one case still pending. Accordingly, JUSTICE ROSE asserts that any claim by FitzSimmons and her clients based on this ground has been waived because FitzSimmons has not consistently moved to disqualify JUSTICE ROSE. Further, JUSTICE ROSE cites the record of rulings in her cases as clear evidence that he is fair and impartial in cases where FitzSimmons is an attorney for a party.

## DISCUSSION

### The disqualification of Justice Rose

At the outset, we must place the remarks made by JUSTICE ROSE concerning FitzSimmons in context. Late 1993 and 1994 was a political year for JUSTICE ROSE since he was up for re-election in November 1994. His re-election was opposed by FitzSimmons. The controversy between JUSTICE ROSE and FitzSimmons began with the *Whitehead v. Nevada Commission on Judicial Discipline* case, and this extremely high profile case became as much a political as a legal matter in the state. JUSTICE ROSE's comments were not about the substance of the *Whitehead* case, or any other, but about the activities of his opponents.

Admittedly, a few of JUSTICE ROSE's comments may have been better not made; however, the political realities of the situation cannot be ignored. JUSTICE ROSE was in a difficult campaign for re-election, and FitzSimmons was actively opposing him. Reasonable latitude should be given for activities or statements made by a judge or justice in a political campaign about attorneys who are actively opposing the jurist. In a state with a relatively small number of attorneys disqualifying judges because an attorney before them had participated in the process or had opposed a judge or justice would subject many judges and justices to disqualification. We recognized this precise point in In re Petition to

Recall Dunleavy, 104 Nev. 784, 790-91, 769 P.2d 1271, 1275 (1988):

> In a small state such as Nevada, with a concomitantly limited bar membership, it is inevitable that frequent interactions will occur between the members of the bar and the judiciary. Thus, allegations of bias based upon a judge's associations with counsel for a litigant pose a particularly onerous potential for impeding the dispensation of justice.

We believe a judge or justice should be disqualified because of his bias or animosity toward an attorney for a party only in extreme situations, and we have so held in numerous cases. Sonner v. State, 112 Nev. 1328, 930 P.2d 707 (1996) (holding that the fact that the prosecuting attorney had represented the judge on an unrelated matter up until the beginning of the murder case would not disqualify judge from presiding); Valladares v. District Court, 112 Nev. 79, 910 P.2d 256 (1996) (holding that a judge is not disqualified even though the judge challenged the attorney's ethics, honesty, and competency in prior election campaign); Ainsworth v. Combined Ins. Co., 105 Nev. 237, 774 P.2d 1003 (1989) (holding that a justice is not disqualified for bias even though he referred to a party's attorney as the "loser" over 100 times in a response to motions). Legal authority throughout the United States is generally in accord with our decisions. "[T]o warrant judicial disqualification—much less other, more drastic sanctions—the judge's bias toward the attorney ordinarily must be extreme. Situations in which judges have manifested such extreme bias toward an attorney are exceedingly rare." Richard E. Flamm, Judicial Disqualification § 4.4.4, at 124 (1996).

In reviewing the statements made by JUSTICE ROSE about FitzSimmons' activities, we find that the statements are not critical of FitzSimmons' ability or character and have none of the vindictiveness found in the statements made in *Valladares* where the attorney's ethics, honesty, and competency were challenged. To the contrary in this case, JUSTICE ROSE has always acknowledged that FitzSimmons is an excellent attorney and a very persuasive advocate. A lawyer should not be permitted to create a situation involving a judge and then claim that the judge should be disqualified because of the events the attorney created. State v. Jeffers, 661 P.2d 1105, 1128-29 (Ariz. 1983). Nor should a judge be precluded from stating that an attorney or group of attorneys oppose him in an election and the reason for said opposition. Thus, a party or his attorney should not be permitted to cause the disqualification of a judge by virtue of his or her own intentional

actions. Richard E. Flamm, Judicial Disqualification § 21.4 (1996); United States v. Helmsley, 760 F. Supp. 338, 342 (S.D.N.Y. 1991) (holding that hostile attacks by a party, much less by its lawyer, are not a sufficient basis for recusal); State v. Jeffers, 661 P.2d 1105 (Ariz. 1983). FitzSimmons does not contest the fact that she was actively opposing JUSTICE ROSE and supporting his opponent.

Based upon these observations, we believe that this situation is in line with *Valladares, Ainsworth,* and *Sonner* and that any disqualification of a judge or justice because of bias against an attorney for a party should be restricted to those cases where malice is obvious and there is little question that the judge or justice can not be fair and impartial.

Hecht has cited PETA v. Bobby Berosini, Ltd., 111 Nev. 615, 895 P.2d 1269 (1995), and the Nevada Code of Judicial Conduct, Canon 3(E), for the proposition that a judge should disqualify himself or herself whenever an appearance of impropriety will arise. However, *PETA* dealt with a district judge's association with a group whose activity was similar to that of a party and not with the relationship of the judge and an attorney for one of the parties. Furthermore, the holding in *PETA* was not followed in the later case of Snyder v. Viani, 112 Nev. 568, 916 P.2d 170, *cert. denied,* ...... U.S. ......, 117 S. Ct. 385 (1996), where the Court rejected the *PETA* standard and reverted to the prior standard of whether there was a direct, ongoing pecuniary or personal interest in determining a judge's disqualification. To the extent that our holding today is inconsistent with *PETA,* we modify *PETA* accordingly. While the Nevada Code of Judicial Conduct does state that a judge can be disqualified for animus toward an attorney, such disqualification should be restricted to those extreme situations not presented in this case.

In reaching our conclusion today, we have given substantial weight to JUSTICE ROSE's opinion that he can be fair and impartial in any case where FitzSimmons represents a party. Many times we have stated that a judge or justice's opinion concerning his or her bias or prejudice should be given substantial weight. *Sonner,* 112 Nev. at 1335, 930 P.2d at 712 ("this court has always accorded substantial weight to a judge's determination that he can fairly and impartially preside over a case"); *see also* Goldman v. Bryan, 104 Nev. 644, 649, 764 P.2d 1296, 1299 (1988). JUSTICE ROSE's opinion is reinforced by the fact that in FitzSimmons' cases where he has sat as a justice since her allegations of bias, FitzSimmons' clients have won most of those appeals.

Our decision today is also in line with this court's previous concern about the disqualification of judges and justices because of a judge's bias against an attorney of record. In In re Petition to

Recall Dunleavy, 104 Nev. 784, 790, 769 P.2d 1271, 1275 (1988), we stated:

> To permit an allegation of bias, partially founded upon a justice's performance of his constitutionally mandated responsibilities, to disqualify that justice from discharging those duties would nullify the court's authority and permit manipulation of justice, as well as the court. *See* State v. Rome, 685 P.2d 290, 295-96 (Kan. 1984); *see also* Tynan v. United States, 376 F.2d 761 (D.C. Cir. 1967), *cert. denied,* 389 U.S. 845.

If we permitted FitzSimmons to disqualify JUSTICE ROSE every time she represented a party or associated to represent a party before the Nevada Supreme Court, she would have a potent weapon that would permit her to disqualify one justice of the court in any case. We are reluctant to extend this advantage to any party unless a clear, substantial showing of actual bias has been made establishing a judge's or justice's bias against a party's attorney.

### *The waiver of grounds to disqualify a judge*

JUSTICE ROSE has been challenged in only half the cases in which FitzSimmons has appeared as counsel since the beginning of the alleged bias by JUSTICE ROSE. Grounds for disqualifying a judge can be waived by failure to timely assert such grounds. *See* In re Steven O., 279 Cal. Rptr. 868 (Ct. App. 1991); In re Marriage of Fifi, 776 P.2d 1167 (Colo. Ct. App. 1989). While the above cases concern untimely motions to disqualify a judge after the judge has ruled on certain aspects of a case, the reasoning of those cases appears equally applicable to FitzSimmons' attempt to disqualify JUSTICE ROSE in only some of the cases where she has appeared as counsel for a party. Therefore, attorneys who seek to disqualify a judge because of bias or prejudice toward counsel should do so consistently or risk having their challenges considered waived by this court.

### *This is not a gaming case*

Hecht claims that this case presents a gaming issue and that JUSTICE ROSE is precluded from participating because of Gaming Regulation No. 12. Regulation 12 requires that any judge or justice holding a gaming license refrain from participating in gaming related matters. Our case law makes clear that a "gaming issue" for a judge or justice is to be narrowly construed and "is one that involves the Gaming Control Board or Commission, its members or employees, or the enforcement or interpretation of

Nevada gaming statutes." Snyder v. Viani, 112 Nev. 568, 577, 916 P.2d 170, 175 (1996).

JUSTICE ROSE owned a restaurant/bar and the real property on which it was located, which he sold in 1995. In exchange, JUSTICE ROSE received a promissory note from the individuals who purchased the stock of the corporation that owns the real property and business. The debt is secured by a pledge of the stock and a trust deed on the real property in favor of JUSTICE ROSE. FitzSimmons claims that this debt owed by a gaming enterprise to JUSTICE ROSE provides sufficient interest in gaming to justify his disqualification.

First, we do not consider the holding of an accounts receivable from a gaming establishment to be a substantial, direct, personal, or pecuniary interest in gaming. Further, we answered Hecht's allegation in Snyder v. Viani, 112 Nev. 568, 916 P.2d 170, *cert. denied*, ...... U.S. ......, 117 S. Ct. 385 (1996), where a similar claim was made against JUSTICE ROSE—that he had owned a bar/restaurant and therefore possessed a gaming interest. The *Snyder* court stated that a judge's disqualifying interest " 'must be a present interest in the outcome of the proceeding, 'not some indirect, remote, speculative, theoretical, or possible interest.' ' " *Id.* at 575, 916 P.2d at 174 (quoting Goldman v. Bryan, 104 Nev. 644, 651, 764 P.2d 1296, 1300 (1988) (quoting State v. Scarborough, 410 P.2d 732, 734 (N.M. 1966))). The *Snyder* court concluded that JUSTICE ROSE's interest in the bar was not an ongoing interest because he had sold the bar prior to the decision in the case and that his consideration of the case was proper. *Snyder*, 112 Nev. at 575-76, 916 P.2d at 174-75. If the ownership of a bar/restaurant is insufficient to be considered an interest in gaming, holding a promissory note after the sale of the property is certainly more remote than owning the property itself.

This is a condemnation issue, not a gaming case, and JUSTICE ROSE's account receivable from a gaming entity located fifteen miles away from the condemned property does not qualify as an interest in gaming.

## CONCLUSION

Hecht has not met his burden to establish that JUSTICE ROSE is prejudiced against their attorney, FitzSimmons. We also conclude that this is not a gaming case requiring JUSTICE ROSE to recuse himself. Accordingly, Hecht's motion to disqualify JUSTICE ROSE is denied.

SHEARING, C. J., concurs.

Sullivan, D. J., concurring:[1]

I concur in the judgment denying the motion to excuse JUSTICE ROSE but write separately because I see a number of other reasons to reach the same conclusion as those stated in the majority opinion.

First of all, the law is clear in this matter. NRS 1.225 requires that:

> 1. A justice of the supreme court shall not act as such in an action or proceeding when he entertains actual bias or prejudice for or against one of the *parties* to the action.
> 2. A justice of the supreme court shall not act as such in an action or proceeding when implied bias exists in any of the following respects:
> (a) When he is a party to or interested in the action or proceeding.
> (b) When he is related to either party by consanguinity or affinity within the third degree.
> (c) When he has been attorney or counsel for either of the parties in the particular action or proceeding before the court.
> (d) When he is related to an attorney or counsel for either of the parties by consanguinity or affinity within the third degree.
> 3. A justice of the supreme court, upon his own motion, may disqualify himself from acting in any matter upon the ground of actual or implied bias.

(emphasis added). This statute contemplates bias against the party to the action and not against the attorney for the party. Even though the ethics rules go further and contemplate disqualification for demonstrated bias against the attorney for the party, this court ought not to go further than the legislative mandate of NRS 1.225.

Furthermore, the judicial ethics rules cited by the parties in this case are irrelevant for this court's consideration in disqualifying a supreme court justice. *See, e.g.,* Canon 3(E). Those rules apply to disciplinary actions and are handled by a separate body for consideration. Certainly the ethics rules are important in each judge's own consideration of whether he or she should disqualify themselves.

Secondly, the court should return wholeheartedly to the policy

---

[1]The Governor designated the Honorable Jerry V. Sullivan, Judge of the Sixth Judicial District Court, to sit in the place of THE HONORABLE A. WILLIAM MAUPIN, Justice. Nev. Const. art. 6, § 4.

enunciated in In re Petition to Recall Dunleavy, 104 Nev. 784, 790-91, 769 P.2d 1271, 1275 (1988).

> [A] allegation of bias in favor or against an attorney for a litigant generally states an insufficient ground for disqualification because "it is not indicative of extrajudicial bias against a 'party.' " In a small state such as Nevada, with a concomitantly limited bar membership, it is inevitable that frequent interactions will occur between the members of the bar and the judiciary. Thus, allegations of bias based upon a judge's associations with counsel for a litigant pose a particularly onerous potential for impeding the dispensation of justice.

(citations omitted). *See* Ainsworth v. Combined Ins. Co., 105 Nev. 237, 774 P.2d 1003 (1989). It is clear in the environment in which the small Nevada bar operates that lawyers and judges will have disagreements and take opposite stands. In order for the judicial system to function in this state, the judge and the attorney must set aside differences and the judge must mete out justice and make rulings based upon the law. Likewise, the attorney must present his or her case with civility.

Furthermore, if after a disagreement or an interaction between an attorney and a judge, the attorney moves to disqualify the judge on all subsequent cases, and this court sanctions this in any fashion, the court is allowing unjustified judge-shopping. The power of the judiciary could be manipulated and eroded. NRS 1.225 requires that disqualification have merit—actual or implied bias against the party whom the attorney represents.

SPRINGER, J., dissenting:

On May 30, 1997, JUSTICES ROSE and SHEARING and Judge Sullivan entered a one-sentence order denying the motions to disqualify JUSTICE ROSE and JUSTICE YOUNG. In response to the May 30 order I filed a twelve-page dissent in which I maintained:

> 1. It is improper for JUSTICE ROSE and JUSTICE YOUNG to "take turns" in voting on the other's qualifications. Each is the "swing vote" on the other's case; and I believe that the proper thing for each of them to have done (each being accused of having a bias in this case) would have been to stay out of the decision-making process on the two motions that have been filed to disqualify them.
>
> 2. It is improper for JUSTICE ROSE to continue to sit in this gaming case, given the fact that he is required by law to remove himself from "gaming cases." The subject matter of this litigation is an eminent domain proceeding, the purpose of which is to condemn respondents' property and turn it

over to a joint venture "comprised of" ten downtown Las Vegas casinos. JUSTICE ROSE has, as a general rule (with one notable exception[1]), disqualified himself in these kinds of cases. JUSTICE ROSE's insistence upon remaining in *this* case and not in other, similar cases provides, of itself, (without considering the other grounds for questioning his impartiality) grounds upon which his "impartiality might reasonably be questioned." Code of Judicial Conduct, Canon 3E(1)(d).[2]

3. It is improper for JUSTICE ROSE to continue to sit in this case by reason of the extreme prejudice that he has displayed against one of the attorneys for parties who oppose efforts to force them to turn their land over to the "Fremont Experience." JUSTICE ROSE has publicly proclaimed that respondents' attorney is part of a cabalistic "coalition" (in combination with three former chief justices of this court) that is conspiring to defame him and ruin him politically. Still, JUSTICE ROSE unconvincingly insists that he holds no

---

[1]JUSTICE ROSE is required by law to remove himself in "gaming cases." When hotel-casinos are involved in litigation, JUSTICE ROSE has, for the most part, voluntarily removed himself from such cases; *e.g.,* when the Hilton Hotel and Casino was involved in litigation involving a prize-fight controversy (Hilton Hotels v. Butch Lewis Productions, 107 Nev. 226, 808 P.2d 919 (1991) and Hilton Hotels v. Butch Lewis Productions, 109 Nev. 1043, 862 P.2d 1207 (1993)), and when the Nugget Hotel and Casino was involved in a dispute with a linen service (GNLV Corp. v. Service Control Corp., 111 Nev. 866, 900 P.2d 323 (1995)), JUSTICE ROSE voluntarily disqualified himself. When the Nugget got involved in litigation with Donald Trump, however, JUSTICE ROSE stayed in the case. Trump v. District Court, 109 Nev. 687, 857 P.2d 740 (1993). I cannot discern what criteria are being employed by JUSTICE ROSE in determining when to remain in gaming cases; but I must say that I fail to see any distinction between the cases in which he disqualifies himself and the cases in which he decides not to disqualify himself. To me, *Trump* and the present case, which involves the interests of ten gaming casinos, are indistinguishable from the linen service case and the prize-fight case and other gaming licensee cases in which JUSTICE ROSE has disqualified himself.

[2]Concurring Judge Sullivan takes the rather odd position that "judicial ethics rules," and in particular "Canon 3E," are "irrelevant for this court's consideration in disqualifying a supreme court justice." Thus, Judge Sullivan maintains that "ethics rules are important [only] in each judge's own consideration of whether he or she should disqualify themselves [sic]." Fortunately, "Let your conscience be your guide" is not the standard for judicial qualifications. The Judicial Code of Conduct, enacted by this court, is mandatory, and Canon 3E mandates that a "judge *shall* disqualify himself" under conditions set forth in the Code. (Emphasis added.) Judge Sullivan's position does, however, cast an interesting light on these proceedings because it reveals an attitude on the part of at least one member of the three-judge majority that rules of ethics are "irrelevant" when it comes to deciding matters of this kind. One must wonder if the other two members of the majority agree with Judge Sullivan.

ill-will or bias against this attorney and that he will be able to treat her with justice and equanimity. I do not think so.

4. As appears in the majority opinion, JUSTICE YOUNG'S son-in-law is a member of the firm that represents "The Fremont Experience," Lionel, Sawyer and Collins. Ever since his son-in-law became a member of that firm, JUSTICE YOUNG, either because he believed that he was legally disqualified or because he believed that his "impartiality might be reasonably questioned," has voluntarily removed himself from all cases involving this firm. Mr. Samuel Lionel has filed an appearance in this case and, additionally, has filed a petition in this court seeking to overturn the trial court's judgment and obtain a judgment of this court which would allow the condemnation proceedings to be carried out, thus permitting his client, The Fremont Experience, to take possession of the land in question. Similar to JUSTICE ROSE'S situation, JUSTICE YOUNG'S making an exception, *in this case,* gives rise to an appearance of impropriety and creates a condition under which his "impartiality might reasonably be questioned."

It is not my intention, in this dissenting opinion, to go into the detail that I went into in my May 30 dissent; and those readers who are interested in going into more depth in this matter are invited to examine that document. I file this dissenting opinion in opposition to each of the three-judge majority opinions denying the motions to disqualify JUSTICE YOUNG and JUSTICE ROSE. For present purposes, I find it necessary only to deal, rather cursorily (and curiously), with the explanations given by the majority for its allowing JUSTICES YOUNG and ROSE to continue to sit in this case.

1. *The Rose Disqualification: The Majority Incorrectly Holds that Justice Rose's Bias is not so "Extreme" as to Require his Disqualification.* The majority concedes that a disqualification of JUSTICE ROSE may be warranted if his "bias against [the] attorney . . . [is] *extreme.*" (Emphasis added.) I differ with the majority in my understanding of the word "extreme." The majority informs us that JUSTICE ROSE'S "comments may have been better not made" and that they were "based on what JUSTICE ROSE had been informed FitzSimmons was *doing against him.*" The majority fully understands that JUSTICE ROSE was, to some degree at least, "out of line" and that JUSTICE ROSE is convinced that Ms. FitzSimmons has been doing things "against him." The majority is also aware of JUSTICE ROSE'S public announcement, in a document filed in this appeal, that Ms. FitzSimmons is engaged in a conspiracy with three former chief justices of this court to

ruin him. It is difficult for me to understand how JUSTICE ROSE'S admitted ill-feeling and bias against Ms. FitzSimmons can be said to be anything other than "extreme."[3]

2. *The Rose Disqualification: The Majority is Incorrect in Relying on the Supposition that Gaming Will not be Conducted on the Condemned Premises.* JUSTICE YOUNG tells us in his majority opinion that no gaming "will be conducted on the condemned property." It does not matter where gaming is eventually conducted; what matters is that this is clearly a gaming enterprise, conjured for the benefit of the ten downtown casinos.

There is nothing obscure or uncertain about this case. A public entity, created for the purpose (the Downtown Development Agency) is to condemn the property in question and turn it over to Mr. Lionel's clients, the Liability Corporation and the Parking Company. Mr. Lionel has told the court that the Corporation, which will ultimately "receive" the condemned property, is "comprised" of gaming casinos. If JUSTICE ROSE disqualifies himself in cases in which gaming casinos are litigating with prize-fight promoters and linen suppliers (see footnote 1), then perhaps he should disqualify himself in a case in which the principal, if not sole, beneficiaries of the litigation are gaming casinos. According to Mr. Lionel, his clients are the "legally

---

[3]In the document filed in this case by JUSTICE ROSE on January 29, 1997, mentioned above, JUSTICE ROSE accuses respondents' counsel, Laura FitzSimmons, of being part of an ongoing conspiracy against him, a conspiracy which he calls the "GUNDERSON/Whitehead/ SPRINGER/STEFFEN coalition." The ROSE document is comprised of a long bill of complaints against Ms. FitzSimmons and against the mentioned conspiratorial coalition, including charges that Ms. FitzSimmons was part of a plan to make public sealed criminal charges that had been filed by a Metropolitan police officer against JUSTICE ROSE, and that, had it not been for Ms. FitzSimmons and her co-conspirators, these charges would have been kept from the public eye and remained "sealed" by order of District Judge Nancy Becker in Las Vegas. Ms. FitzSimmons vehemently denies that she is part of any such conspiracy; but it is obvious from JUSTICE ROSE'S January 29 document that he earnestly believes that Ms. FitzSimmons is conspiring to destroy him. In my judgment, these beliefs and the other charges which JUSTICE ROSE makes against Ms. FitzSimmons in his January 29 document create a strong appearance of *extreme* bias on the part of JUSTICE ROSE and lead to the almost inescapable inference that it is impossible for JUSTICE ROSE to sit in impartial judgment in this case while Ms. FitzSimmons is acting as counsel.

I note in passing that JUSTICE ROSE justifies his inflammatory public remarks about Hecht's attorney, Laura FitzSimmons, by saying that they were only "made in response to statements or actions of Laura FitzSimmons" and that his feelings and statements against this attorney were, therefore, "not evidence of any disqualifying bias." With regard to the argument that retaliatory remarks do not count and that JUSTICE ROSE was provoked into doing what he has done, I submit that whatever might have prompted JUSTICE ROSE to behave in the way that he has, his conduct should be "admitted" as "evidence of . . . disqualifying bias" on his part.

aggrieved" parties in this litigation because they have "a right to equitable title to the properties after they are condemned." Whether gaming will be conducted in the garage or in other portions of the condemned property is not of much consequence. The real parties in this case, those who are "legally aggrieved," are gaming licensees. JUSTICE ROSE disqualifies himself in these kinds of cases because he, obviously, considers them to be "gaming cases."

3. *The Young Disqualification: The Majority Opinion Fails to Reckon with the Fact that Justice Young has for a Number of Years Disqualified Himself in All Lionel-Sawyer Cases; Yet Insists Upon Remaining in this One.* The majority opinion claims that JUSTICE YOUNG's disqualification is not required in this case because "Hecht has presented no evidence that JUSTICE YOUNG's son-in-law was actually representing "The Fremont Experience" and no evidence that "JUSTICE YOUNG's daughter has [any] direct economic interest in the subject matter in controversy," (that is to say, the controversy as to whether the ten-casino combine, The Fremont Experience, will be allowed to develop the Hecht property). The answer to this is simple, JUSTICE YOUNG himself has already decided that ethics and propriety demand that he remove himself in all Lionel-Sawyer cases. Whether JUSTICE YOUNG's son-in-law actually works on a Lionel-Sawyer case or his daughter receives some ultimate benefit out of the decision in a case does not matter because JUSTICE YOUNG, himself, has already made the judgment that he must get out of Lionel-Sawyer cases. At last count, JUSTICE YOUNG has removed himself from twenty-one Lionel-Sawyer cases without ever considering the issues which upon which the majority opinion relies. Perhaps, from now on, JUSTICE YOUNG intends to sit in Lionel-Sawyer cases unless there is "evidence" that his daughter is going to make some money out of the case; but I rather doubt it. What should be forthcoming from JUSTICE YOUNG is an explanation as to why he decided to remain in *this* case and this case only. Absent such an explanation, he should retire from the case as he does from all other Lionel-Sawyer cases.

4. *The Young Disqualification: The Majority is Incorrect in Relying on the Premise that "The Fremont Street Experience is not a Party to this Litigation."* Similar to the point that JUSTICE YOUNG's daughter does not stand to make any money out of the Fremont Experience's winning this appeal, the question of whether Mr. Lionel's client, The Fremont Experience, is or is not a party to this appeal is totally immaterial.

As pointed out in my May 30 dissent, Mr. Lionel's clients are interested, if not actual, parties to this appeal. Mr. Lionel, believing that his clients were proper parties to this appeal, filed,

*in this appeal,* on behalf of his client, on February 29, 1996, a document entitled "Appearance Pursuant to NRS 37.080 and Opening Brief." Mr. Lionel argued in this document that although his clients were "not named as parties below," they were (already) "in occupation of the property described in appellant's complaint for eminent domain." Later on March 29, 1996, Mr. Lionel filed another document in this appeal, entitled, "Opposition to Motion for Disqualification of JUSTICE ROSE," in which he, not surprisingly, argued that JUSTICE ROSE should remain in the case. Although the record is not clear to me, it seems as though, somehow, Mr. Lionel's documents were "stricken" from the record, so that Mr. Lionel arguably is no longer counsel of record in this appeal (although, I note, the Lionel-Sawyer firm is still on the list of counsel of record in this case and is still served with all documents filed in this appeal). As I have said before, however, it does not make a particle of difference whether, technically, Lionel-Sawyer remains as counsel of record in this case. The point is made by Mr. Lionel himself: His clients are obliged to provide the "financing, leasing and operation of the Fremont Street Experience"; his clients "possess a right to equitable title to the properties under the Agreement, and . . . acquisition of legal title to such properties is essential to the consummation" of the construction and management of the project and the property which is the subject of this appeal. JUSTICE YOUNG should have disqualified himself, as he always does; and this court should have granted the motion to disqualify him.

It is hard not to editorialize on the obvious and to be critical of my colleagues and the court which now permits them to sit in judgment in this case. Rather than say more, I will let the readers of this dissent draw their own conclusions.